Hillsborough
No. 81-182

### THE STATE OF NEW HAMPSHIRE

v.

### FRANK W. DUSTIN

June 14, 1982

*Gregory H. Smith*, attorney general (*Michael A. Pignatelli*, assistant attorney general, on the brief and orally), for the State.

*Brown & Nixon P.A.*, of Manchester (*David W. Hess* on the brief and orally), for the defendant.

BOIS, J.   The defendant appeals from a jury verdict finding him guilty of criminal restraint under RSA 633:2. He focuses his challenge on the trial court's decision to permit certain allegedly prejudicial statements and questions by the prosecution. We affirm his conviction.

On the evening of July 27, 1979, the complainant, twenty-two-year-old Brenda Baron, was hitchhiking from Nashua to Merrimack. The defendant, Frank Dustin, and Donald Croto, a companion of his, were passing by in a pickup truck and stopped to give

her a ride. Miss Baron entered the truck, which was driven by the defendant, and sat between the two men.

Miss Baron testified that, at the outset, she told the men of her intention to get out at the traffic lights near McDonald's Restaurant in Merrimack. She further testified that both men were drinking beer and that, despite her repeated requests and fervent pleas, which the defendant acknowledged she had made, the men refused to let her out of the truck at the desired location.

According to Miss Baron's testimony, Croto said that the men were going to take her to a party in Manchester. At that point, Miss Baron became frightened and began crying. She testified that she thought the men were going to beat her up or rape her. While the vehicle was moving, she grabbed the gearshift lever and attempted to place it in park. The defendant pushed her away and allegedly told Croto angrily: "Keep her quiet." Miss Baron then attempted to jump out of the open window on the passenger side of the vehicle. She hung out the window, screaming frantically for help, and was seen or heard by at least two witnesses. She testified that Croto pulled her back and punched her in the mouth. Approximately five minutes after passing the traffic lights near McDonald's Restaurant in Merrimack, the defendant stopped the truck and let Miss Baron out.

Not surprisingly, the defendant's version of these events differed dramatically from Miss Baron's account. He testified that he was unaware of the traffic lights near McDonald's Restaurant in Merrimack and that, although Miss Baron may have stated her desire to get out of the vehicle, he did not hear these statements. He claimed that he stopped the truck as soon as possible after he heard Miss Baron's request to get out.

Defense counsel objected to remarks which the prosecutor made, in his opening and closing arguments, regarding Miss Baron's fear of being raped during the incident. In addition, defense counsel objected to the prosecutor's questions concerning Miss Baron's mental state during the events in question. The Trial Judge (*Cann,* J.) overruled these objections and, as noted, the defendant was convicted of criminal restraint in violation of RSA 633:2. On this appeal, the defendant argues that the references to Miss Baron's fear of sexual molestation and bodily injury were irrelevant and unduly prejudicial, and that the trial court therefore erred in permitting these remarks.

■ Evidence is relevant if it tends in any way to establish a proposition which is of consequence in an action. *State v. Ebelt,* 121

N.H. 143, 144, 427 A.2d 29, 30 (1981); *see State v. Woodard*, 121 N.H. 970, 975, 437 A.2d 273, 275 (1981).

▮▮ RSA 633:2 (Criminal Restraint) provides that "[a] person is guilty of a class B felony if he knowingly confines another unlawfully in circumstances exposing him to risk of serious bodily injury." We have held that the phrase "serious bodily injury" includes mental anguish and psychological injuries. *State v. Goodwin*, 118 N.H. 862, 868, 395 A.2d 1234, 1237–38 (1978). In this case, the disputed evidence and statements regarding the complainant's fear of rape and bodily injury suggested that she might suffer psychological injuries as a result of the incident. The evidence was therefore relevant because it tended to prove an element of the offense; namely, that circumstances existed exposing Miss Baron to a risk of "serious bodily injury," as defined above.

▮ In determining the admissibility of evidence which is relevant and otherwise unobjectionable, the trial court should balance the potential prejudice of the evidence against its probative value. *State v. Baker*, 120 N.H. 773, 775, 424 A.2d 171, 172 (1980). In the instant controversy, the disputed remarks about the complainant's fear of rape and bodily injury, although relevant, were not essential to the prosecution's case. The offense of criminal restraint did not require proof of the complainant's state of mind, and other less inflammatory evidence existed showing that Miss Baron was exposed to a "risk of serious bodily injury." For these reasons, we find that the trial court may have acted ill-advisedly in permitting the disputed remarks regarding the complainant's apprehensions.

Nonetheless, we hold that the admission of the challenged statements did not constitute reversible error because, in the absence of such statements, the jury would have still reached the same substantive conclusions as were conveyed by the inadmissible remarks. The record contains abundant admissible evidence which would have lead any reasonable juror to believe that the complainant was fearful of being raped and beaten by the defendant and Croto. The complainant testified that the defendant refused to stop the truck despite at least six requests by her. She stated that, during the events in question, the defendant yelled at her and spoke to her in a nasty tone of voice. The defendant admitted that the complainant may have "said something about getting out" of the truck. He also admitted that Miss Baron was crying hysterically, that she tried to jump out of the moving truck on two occasions, and that she told him that she was scared. His only explanation for her behavior was that she was crazy. This explanation, however, was not supported by any other evidence.

As previously mentioned, one witness testified that she saw Miss Baron hanging from the window of the truck, screaming loudly for help. The same witness stated that she saw the complainant immediately after the alleged incident, and that Miss Baron was "very nervous, panicky . . . and crying fiercely." Another witness testified that while she was in her home she heard a loud scream and that she subsequently met with the complainant, who was "crying, really hysterical." She further testified that she stayed with Miss Baron for two or three hours after the incident and that the complainant remained very upset throughout this period.

An additional witness stated that she saw the defendant's truck stop near the Merrimack police station, as the complainant had testified, and that "it looked as if there was a struggle on the inside of the truck." Finally, the police officer who attended to Miss Baron after the alleged incident testified that she had a swollen lip which was bleeding profusely. This testimony appeared to corroborate Miss Baron's claim that Croto had punched her in the mouth.

■ Certainly, in light of all the above-mentioned testimony and the dearth of any other plausible explanations for Miss Baron's behavior, a rational juror would have concluded, independently of the challenged remarks, that Miss Baron was afraid of suffering substantial bodily injury at the hands of the defendant and Croto. Thus, we hold beyond a reasonable doubt that the inadmissible evidence regarding the complainant's fears did not affect the jury's decision. *See State v. Welch*, 120 N.H. 687, 688, 421 A.2d 142, 142–43 (1980); *State v. Ruelke*, 116 N.H. 692, 694, 366 A.2d 497, 498 (1976).

■ Furthermore, a review of the record reveals that the trial court minimized any prejudice which might have arisen from the admission of the disputed statements. The court properly instructed the jury regarding the State's burden of proof, and the elements of criminal restraint and the lesser-included offense of false imprisonment (RSA 633:3). *See generally State v. Langdon*, 121 N.H. 1065, 1068, 438 A.2d 299, 301 (1981). The court also gave the jury a correct definition of the statutory phrase "serious bodily injury." *Cf. State v. Bird*, 122 N.H. 10, 16, 440 A.2d 441, 444 (1982). As a result, we conclude that the admission of the disputed statements and testimony was harmless in the context of this case. *See State v. Scarlett*, 121 N.H. 37, 42–43, 426 A.2d 25, 28–29 (1981); *State v. Koski*, 120 N.H. 112, 115, 411 A.2d 1122, 1124 (1980); *State v. Gosselin*, 117 N.H. 115, 120, 370 A.2d 264, 269 (1977).

The defendant also argues that prejudice resulted when the trial court admitted into evidence a diagram, drawn by the complainant, showing the times and relative physical locations of the events at issue. He contends that the diagram failed to include significant landmarks, and distorted numerous physical facts otherwise in evidence.

■■ The decision to admit documentary evidence falls within the sound discretion of the trial court. *Marchand v. Company*, 95 N.H. 422, 424–25, 65 A.2d 468, 470 (1949); *cf. State v. Perron*, 118 N.H. 245, 246, 385 A.2d 225, 225 (1978). At the start of this case, the trial judge permitted the jury to view the road in Merrimack where the events in question occurred. We hold that the admission of the diagram, albeit roughly drawn, provided the jury with a basis of general reference, thus aiding it in recollecting the site viewed. The trial court, moreover, allowed the defendant to impeach the accuracy of the diagram on several occasions. Consequently, we cannot say that the trial judge erred in finding that the probative value of the diagram outweighed the possible prejudice which it might have produced. *See State v. Perron*, 118 N.H. at 246, 385 A.2d at 225; *State v. Breest*, 116 N.H. 734, 751, 367 A.2d 1320, 1333 (1976).

■ Finally, the defendant contends that the prosecution improperly and prejudicially attempted to prove that the defendant was responsible for the acts and behavior of Croto. We have reviewed the record and find no merit to this contention. In its opening and closing arguments, the prosecution repeatedly stated that the issue was whether *the defendant, Mr. Dustin*, committed the offense charged. In numerous instances, the prosecution elicited testimony from the complainant which specifically concerned the *defendant's* actions. Furthermore, the trial court cured any potential confusion regarding the defendant's liability, when it clearly and succinctly instructed the jury that the defendant was not on trial for Croto's actions.

Because the court is equally divided, the order is

*Exceptions overruled; affirmed.*

KING, C.J., did not sit; BATCHELDER, J., concurred; DOUGLAS and BROCK, JJ., dissented.

DOUGLAS, J., dissenting: I find the prejudicial effect of the prosecution's references to a possible "rape" to be so egregious as

to have denied defendant the fair trial guaranteed to him by the fourteenth amendment to the Federal Constitution.

The defendant was on trial for *criminal restraint*. In his opening statement the assistant county attorney set the stage for the introduction of facts sufficient to convict the defendant of the crime charged. But he clearly exceeded the bounds of fairness when he said *"They* had other intentions for Brenda." He also said "She is going to tell what was going through her mind." At trial she testified that "I was afraid they were going to take me away and rape me. . . ." These statements are reminiscent of the "spectral evidence" admitted in the seventeenth century Salem witch trials.

This case does not involve defense counsel's failure to object, except, or file a motion in limine. He did everything procedurally necessary to bring to the attention of the trial judge this outrageous planting of the specter of "rape" which gave fruit to a verdict of guilty.

Defendant was not charged with rape, attempted rape, conspiracy to commit rape, kidnapping, or assault. Yet the court permits the prosecutor to obtain a conviction *not* on "what happened" *but* on what went "through her mind," to use his own words. As long ago as 1917 this court noted that a prosecutor who argues "irrelevant facts calculated to prejudice the jury" commits *misconduct* that is fatal to the verdict. *State v. Small,* 78 N.H. 525, 529, 102 A. 883, 886 (1917). The misconduct here was inflammatory and without justification. While a prosecutor must be able to strike hard blows, he is not at liberty to strike foul ones. *See State v. Scarlett,* 118 N.H. 904, 905, 395 A.2d 1244, 1246 (1978).

In *State v. Preston,* 121 N.H. 147, 427 A.2d 32 (1981) this court was compelled to

> "caution prosecutors to avoid misstatements of evidence, improper argument, or other improper conduct. This court has often addressed complaints by criminal defendants of prosecutorial misconduct, although the alleged misconduct usually has not required us to reverse the convictions. . . . It is only fair to state that, because of the continuing problem, we will take a firmer stand in the future. . . . The prosecutor should not 'use arguments calculated to inflame the passions or prejudices of the jury.' "

*State v. Preston,* Id. at 151, 427 A.2d at 34 (citations omitted). The majority opinion changes the yellow warning light of *Preston* to bright green.

In final argument the fears of the witness were turned into fact when the prosecutor said "She was going to be raped. . . ." He continued his conjecture by asking "what plans they had for her" and "what fears were in her mind"? What if she had said they were going to kill or sexually assault her and mutilate her body in a far off land? Where is the legal limit to the imagination of witnesses? In this State, unfortunately, there is apparently none.

But such a holding is not without precedent in our region. During a time when our residents were controlled by the colony of Massachusetts Bay such evidence was much in vogue. In 1692 in the famous Salem witch trials evidence known as "spectral evidence" was admitted. It had its origin in the rich progressive soil of the Spanish Inquisition and had such notable advocates as Bartolommeo Spina who wrote as early as 1523. *See* R. ROBBINS, THE ENCYCLOPEDIA OF WITCHCRAFT AND DEMONOLOGY 477 (1959). As Robbins notes, innocent victims of witchcraft were allowed to testify as to their tormentor's specter, or spirit. *Id.* "Thanks to this arrangement, hallucinations, dreams, and mere fancies would be accepted in court as factual proof not of the psychological condition of the accuser but of the behaviour of the accused." M. STARKEY, THE DEVIL IN MASSACHUSETTS 54 (1969). Obviously some enlightened minds were concerned about the fact that "spectral evidence" was the "sort of 'proof' against which there is no disproof." *Id.* Even such "hard-liners" as Rev. Cotton Mather began to urge that such evidence be used with "caution." R. ROBBINS, *supra*, at 479; *see also* F. HUTCHINSON, HISTORICAL ESSAY CONCERNING WITCHCRAFT (1718), *quoted in id.*

Because this divided court upholds a conviction on the basis of a crime imagined by the victim and prosecutor, and not on the basis of a crime committed, I must dissent. As with spectral evidence, the admission of victims' conjectures is now to be governed only by the limits of their fears and imaginations, whether or not *objectively* proven facts are forthcoming to justify them.

BROCK, J., dissenting: In my opinion the trial court erred in admitting into evidence the victim's testimony concerning what she "thought" the defendant and his friend might do to her if she did not get out of the truck. The defendant was on trial for *criminal restraint*, not rape, attempted rape, conspiracy to commit rape, kidnapping, or assault. That the prejudicial effect of the victim's testimony that she was afraid that they were going to rape her clearly outweighed its probative value is dramatically demonstrated to me by statements made by the prosecutor to the jury. *State v. Baker*, 120 N.H. 773, 775, 424 A.2d 171, 172 (1980); *State v.*

*Farrow*, 118 N.H. 296, 307, 386 A.2d 808, 815 (1978). He stated "[t]hey had other intentions for Brenda. . . . She is going to tell you what was going through her mind", and in his final argument the "thoughts" of the victim were turned into fact when the prosecutor said: "She was going to be raped. . . ." Because the defendant's conviction may have been based *not* upon the crime charged and committed but upon one imagined by the victim and prosecutor, I cannot conclude that the trial court's error in admitting the challenged testimony and allowing the overzealous argument of the prosecutor was harmless beyond a reasonable doubt. *See State v. Scarlett*, 121 N.H. 37, 42–43, 426 A.2d 25, 28–29 (1981).