Hillsborough
No. 82-389
No. 82-551

# THE STATE OF NEW HAMPSHIRE

v.

# CLARENCE ELBERT

May 4, 1984

6

*Gregory H. Smith,* attorney general (*John A. Malmberg,* assistant attorney general, and *Amy L. Ignatius,* attorney, on the brief, and *Mr. Malmberg* orally), for the State.

*James E. Duggan,* appellate defender, and *Joanne S. Green,* assistant appellate defender, of Concord (*Mr. Duggan* and *Ms. Green* on the brief, and *Ms. Green* orally), for the defendant.

SOUTER, J. The defendant was indicted under RSA 629:1 for attempted first-degree murder (RSA 630:1-a) and under RSA 650-A:1 (Supp. 1983) for use of a firearm in the attempt to commit a felony. Following his arrest, the defendant made admissions to the police, which the Superior Court (*Goode,* J.) refused to suppress. Following trial, a jury returned verdicts of guilty to attempted second-degree murder and felonious use of a firearm. The Trial Judge (*Flynn,* J.) imposed consecutive sentences of fifteen to thirty years for attempted murder and ten to twenty years for felonious use of a firearm. The case comes to us on the defendant's exceptions to the ruling on his motion to suppress and to certain rulings at trial and at time of sentence. We affirm on all issues except the challenge to the sentence for felonious use of a firearm, on which the case will be remanded for resentencing.

The record indicates that the events leading to these charges began in Nashua late in the afternoon of November 4, 1981, when the defendant visited Albert Burelle, an acquaintance who entertained the defendant with food and drink. On leaving Mr. Burelle's apartment, at 6 p.m., or shortly before that, the defendant stole a revolver and its holster.

At about the same time, Mr. Burelle's young neighbor, Lisa Cantella, left her family's house and began to walk through Woodlawn Cemetery on her way to a nearby store. When she heard a rustling of leaves, she paused. She heard someone behind her ask "What are you doing in the cemetery? Get out of the cemetery!" She turned to see a man. She ran until a bullet struck the back of her head, and she fell. She survived the gunshot wound, and later described her assailant as black, 5 feet, 8 inches tall, with a scar on his nose, unshaven, having a flat hat, wearing a blue jacket and green baggy pants.

A witness driving past the cemetery in his car at this time saw a man leave the cemetery through a hole in the fence. The witness described the man as black, 5 feet, 11 inches tall, wearing dark clothing.

Later that evening, the defendant went to the apartment of a friend, Victoria Tessier, to whom he said "I'd like to talk to you. I'm in a heap of trouble." He claimed that earlier that day while scuffling with two men, he had discharged a gun. He said he had taken the gun and its holster from the ground and had fled. Then he added, "I hope it didn't go onto the girl." His friend asked whom he meant, and he explained that a girl had been walking with the two men, and "he hoped that when the gun went off, the bullet hadn't sprayed over to the girl." While the defendant was talking, the police came to the apartment looking for him. He hid until they were gone, and then left by a window, explaining to Miss Tessier that he "didn't want to go to prison anymore."

The next day, the defendant walked down the railroad tracks between Nashua and Lowell and threw the gun and holster into the Merrimack River nearby. He then traveled from New Hampshire to New York.

On November 13, 1981, the State filed complaints in the Nashua District Court charging the defendant with attempted first-degree murder, possession of a firearm by a felon, and felonious use of a firearm, and the court issued warrants for his arrest. The FBI later obtained warrants for the defendant's arrest as a fugitive from justice. Independently, the State of New York charged the defendant with criminal offenses committed there. The defendant was held either by New York or the national government until December 31,

1981, when he waived extradition and submitted to the custody of Captain Robert Barry and Detective Donald Hamel of the Nashua Police Department.

At the hearing on waiver of extradition, a lawyer representing the defendant asked the judge to order the Nashua officers not to question the defendant until he had returned to New Hampshire and consulted with counsel there. The judge refused the order on the ground that his jurisdiction ended at the State line.

The Nashua officers and the defendant then began the drive to New Hampshire. After they had left New York City, there was some conversation about the defendant's past history and about his recent criminal difficulties in New York. The defendant asked the officers what charges had been brought against him in New Hampshire, and what penalties they carried. The officers answered his questions by explaining the charges and lesser-included offenses. Though conversation turned to other matters, the defendant returned to the subject of the pending New Hampshire charges.

While traveling through Connecticut, they stopped at a restaurant. Captain Barry was concerned about the defendant's intentions in speaking about the charges against him, for he believed the defendant was "a very street-wise individual." On leaving the restaurant, he therefore orally gave the defendant the *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436 (1966). After each separate warning, Captain Barry asked if the defendant understood the right, and to each question the defendant answered yes. Captain Barry asked him if he had any "problem" talking to the police about the New Hampshire charges without a lawyer present. The defendant said he had no problem, and he indicated he waived his rights.

Captain Barry then asked about the stolen revolver, and the defendant admitted he had stolen it. He described his visit to the Tessier apartment and his disposal of the weapon the next day. In the course of this interrogation, the police emphasized the importance of cooperation. They indicated that concurrent sentences would be a possibility, but they made no promises of any particular recommendations. The defendant said that his conscience had been bothering him, and that he felt better to learn that he had not killed anyone, and that the girl was not dead. At the end of the conversation, the defendant said that he would consult with a lawyer when they reached Nashua, and that thereafter he and the police might talk again. No further statements by the defendant were admitted into evidence.

In support of his exceptions, the defendant first argues that the superior court erred in denying the motion to suppress evidence of the statements he made to the police during the trip from New York

to Nashua. His motion to suppress rested on claims that the arrest was illegal and that his interrogation was a violation of the right to counsel under the sixth amendment of the Constitution of the United States, as applied to the States through the fourteenth amendment. The arrest issue is not before us.

The trial judge on suppression treated the motion as also raising a fifth and fourteenth amendment claim under *Miranda v. Arizona supra*, and at the close of the suppression hearing, the defendant's counsel orally challenged the voluntariness of the defendant's statement. While the record is not as clear as it should be, it is sufficient for us to consider the defendant's exception as raising issues of voluntariness and of violations of both fifth and sixth amendment standards.

Taking the federal fifth amendment issue first, once a defendant has invoked his right to counsel by declining to speak to the police without a lawyer present, the police must refrain from or stop interrogation, *id.* at 474, and scrupulously honor the defendant's right to stop it. *People v. Grant*, 45 N.Y.2d 366, 375 n.1, 380 N.E.2d 257, 262 n.1, 408 N.Y.S.2d 429, 434 n.1 (1978).

While the defendant may thereafter waive the right he had invoked, no claim of waiver may be considered unless the State proves that the defendant without prompting initiated conversation with the police about the subject of the charges. *State v. Beaupre*, 123 N.H. 155, 459 A.2d 233 (1983); *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). To initiate conversation about the charges, the defendant must do more than speak about the details of his present confinement. He must refer to the charges for which he is confined. *Oregon v. Bradshaw*, 103 S.Ct 2830, 2835 (1983). The act of initiating conversation is not itself a waiver of the right to the presence of counsel, however, and the State must further prove that the defendant did make an intentional waiver of that known right. *Id.; see Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

In this case the defendant raised no claim of right to counsel under part I, article 15 of the Constitution of New Hampshire. We note that if he had done so, and if he had earlier invoked his right to the presence of counsel during interrogation, our holding in *State v. Nash*, 119 N.H. 728, 407 A.2d 365 (1979) would require the State to prove that any waiver of that right was express, in the sense that the defendant referred expressly to the right or answered a question that referred to it.

Quite apart from the right to the presence of counsel during interrogation after invocation of fifth amendment rights under

*Miranda*, once judicial proceedings have begun against a defendant, as in this case, the sixth amendment entitles him to the benefit of counsel in a variety of circumstances. *See United States v. Melanson*, 691 F.2d 579, 584–85 (1st Cir. 1981). Among them, of course, is an interrogation. *Brewer v. Williams*, 430 U.S. 387 (1977). Under the sixth amendment, too, a defendant may waive his right to the presence of counsel if he acts with the intent and knowledge that *Johnson v. Zerbst supra* requires.

 When a defendant has challenged the admissibility of his statement by filing a motion to suppress, we have held that under the law of New Hampshire the State must prove beyond a reasonable doubt that the police gave the *Miranda* warnings, that the defendant understood and waived the rights in question and that his statement was voluntary. *State v. Gullick*, 118 N.H. 912, 396 A.2d 554 (1978); *State v. Phinney*, 117 N.H. 145, 370 A.2d 1153 (1977). For simplicity, we hold that the same burden applies when the State must prove the defendant initiated conversation about the charges after invoking his right to silence in the absence of a lawyer, and when sixth amendment standards must be applied. In this case we synthesize the State's burdens this way: the State must prove beyond a reasonable doubt that the defendant initiated discussion of the charges against him prior to waiver of rights and interrogation; that he was advised of his *Miranda* rights; that he understood and waived each of them, including his right to the presence of counsel during questioning; and that he then made a statement voluntarily. The evidence supports the trial court's finding that the State met its burdens in this case.

 We will assume, though we do not hold, that for purposes of the fifth amendment, the statement by New York counsel to the New York judge was an invocation of the right to the presence of counsel during any questioning. The State was therefore required to prove first that the defendant had initiated discussion of the New Hampshire charges against him. The record supports the finding that the State met this burden. There is no evidence that the police initially questioned him about anything. Rather, in the course of conversation the defendant questioned the officers about the New Hampshire charges and potential penalties. His inquiries went beyond mere discussion of his immediate confinement and were similar to those which were found to have initiated discussion in *Oregon v. Bradshaw*, 103 S. Ct. 2830 (1983).

 Turning to the substantive requirements of the fifth and sixth amendment standards, there is evidence of *Miranda* warn-

ings, of the defendant's understanding of his rights, and of his waiver of them. Captain Barry testified at the suppression hearing that he explained each *Miranda* right, that the defendant responded "in each instance" that he understood it, and that "he had no problems to talking to us at that time in the car." That testimony was a sufficient evidentiary basis for the trial court's conclusions. At trial, Captain Barry supplemented this evidence with further testimony that the defendant stated that he had "no problem" in talking with the police about the New Hampshire incidents in the absence of counsel. The court's finding of an intelligent waiver of all rights rested not only on this testimony about the sequence of warnings and waiver, but also on the evidence of the defendant's prior involvement with the criminal law, and his "street-wise" character.

There was no evidence that the waiver was involuntary as having been induced by any representations by the police that the defendant would receive lenient treatment if he answered questions. After a careful examination of the record of Captain Barry's description of the sequence of events on the drive to New Hampshire, we are satisfied that the record indicates that mention of the possibility of concurrent sentences came after the waiver, not before it.

The evidence of such talk is also relevant on the issue of the voluntariness of the statements themselves. On appellate review, it is sufficient to say that such a discussion does not as a matter of law preclude a finding beyond a reasonable doubt that the ensuing statement was voluntary. *See State v. Phinney*, 117 N.H. 145, 370 A.2d 1153 (1977) (police officer had agreed to speak to judge in support of release on personal recognizance); *State v. Geldart*, 111 N.H. 219, 279 A.2d 588 (1971) (police said "things would probably go better" for the defendant if he cooperated). The previous discussion of the record indicates that the trial judge had a sufficient evidentiary basis to conclude that the statements were voluntary. *State v. Reynolds*, 124 N.H. 428, 471 A.2d 1172 (1984).

We turn next to the claim that the charge of attempted first-degree murder should have been dismissed for failure to offer sufficient evidence of premeditation and deliberation, as required by RSA 630:1-a, II. The defendant argues that the trial court's error in submitting this issue to the jury tainted the actual verdict of guilty to a lesser-included offense. We need not consider the merits of this position, since we find that there was sufficient evidence of premeditation and deliberation to warrant the submission of the issue to the jury.

The elements of premeditation and deliberation require proof beyond a reasonable doubt of "some reflection and considera-

tion upon the . . . choice to kill or not to kill, and . . . the formation of a definite purpose to kill." *State v. Greenleaf*, 71 N.H. 606, 614, 54 A. 38, 42 (1902). While the object of the requirement is to rule out action on sudden impulse, no particular period of premeditation and deliberation is required. "The human mind acts with celerity which it is sometimes impossible to measure; and whether a deliberate and premeditated design to kill was formed must be determined from all the circumstances of the case." *Id.* (quoting *People v. Majone*, 91 N.Y. 211, 212 (1883)).

To determine whether the evidence was sufficient for submission of the issue to the jury, we must determine whether a rational juror could have found these elements proven beyond a reasonable doubt, considering all of the evidence and inferences from it in the light most favorable to the State. *State v. Dupuy*, 118 N.H. 848, 395 A.2d 851 (1978); *see State v. Reardon*, 121 N.H. 604, 431 A.2d 796 (1981). We find evidence of the following facts sufficient to satisfy this standard. The defendant stole a gun from his acquaintance a short time before the shooting. He went to the neighboring cemetery where he had no association with the victim until he called to her. After the victim had turned to see the defendant, she began to run from him, whereupon the defendant shot her. The jury could have found the defendant had time for reflection and choice in these circumstances, and the trial court properly submitted the issue to them.

Next, the defendant claims the evidence was insufficient to identify him as the victim's assailant. This claim must be judged under the standard of *State v. Reardon supra*. In support of this claim, it is clear that the testimony based on eyewitness identification was subject to some weakness. The victim did not identify the defendant at trial. As against her description of a man about 5 feet, 8 inches tall, the defendant was about six feet tall; while she described his trousers as green, Mr. Burelle said they were tan; while she said the assailant wore a flat knitted hat, Mr. Burelle recalled none; while she had said the assailant had a scarred nose, the defendant did not have one. These actual or arguable discrepancies are not fatal to proof of identity, however. Their significance must be judged with reference to the sudden and traumatic circumstances of the victim's observation of the assailant. Just as those circumstances limit the weight that can properly be given to her description, so they limit the significance of actual or arguable deviation of her testimony from evidence obtained from other sources.

Other evidence bearing on identity more strongly supports the identification of the defendant as the assailant. The victim's de-

scription of the assailant's skin color and jacket are consistent with other descriptions of the defendant and his clothing, including the description given by the driver who saw the man leaving the cemetery. The driver, in turn, gave a description that fit the defendant. The defendant was shown to have been in the area at the time of the shooting, to have been armed, to have fled and to have made damaging admissions to Miss Tessier and to the police. There was no independent evidence to support the defendant's claim that his admissions truly referred to a scuffle unrelated to the crime charged. Such an evidentiary basis viewed in the light most favorable to the State was sufficient for a finding beyond a reasonable doubt that the defendant was the assailant.

We now consider the claim that the trial court improperly refused to grant a mistrial after Miss Tessier had testified that as the defendant left her apartment by the window she heard him say that he "didn't want to go to prison anymore, and that if the police would stop him he would kill himself." After Miss Tessier's testimony, defense counsel declined the judge's offer to instruct the jury to disregard it and moved for declaration of a mistrial on grounds of prejudice. The motion was properly denied.

The defendant points out that the trial court's ruling on a motion *in limine* had excluded evidence of prior conviction and present parole status. Violation of this prior ruling was not alone sufficient to require the declaration of a mistrial, however. Since there is no claim or suggestion that the prosecutor or the witness had intended to defy this prior order, a mistrial would have been required only if the testimony when given was inadmissible and both preponderantly and irremediably prejudicial. *See State v. Dustin*, 122 N.H. 544, 547–48, 446 A.2d 1186, 1188–89 (1982). It was none of these.

As a general rule, statements of a defendant are admissible if relevant. C. McCormick, Handbook of the Law of Evidence § 145, at 311 (2d ed. 1972). Though more than one interpretation of the defendant's statement was possible, it could be understood to imply that the defendant was subject to further imprisonment based on guilt. It was therefore admissible unless its probative value was outweighed by the risk of exciting undue prejudice by the disclosure of prior convictions. *Id.* § 185 at 439; *see State v. Dustin supra.*

While in the abstract the risk of prejudice would have prevailed over the probative value, in the actual circumstances of this trial the court correctly concluded otherwise. At the time of the testimony, the jury already had heard evidence that the defendant had arrived

at the witness' apartment armed with a gun, which he had admitted shooting in a scuffle earlier that day. Except for his own statement, there was no evidence of such a scuffle and shooting. There was evidence that he was fleeing from the police at the time of the statement. It could hardly have surprised the jury that such a man had spent time in a prison. Later, the jury would hear that the defendant had admitted stealing the gun.

Thus, in the context of the case, the statement was not so prejudicial as to require its exclusion as a matter of law. In any case, on the foregoing analysis, we conclude that the trial court could have found beyond a reasonable doubt that the admission of evidence of imprisonment was, at the most, harmless error and therefore no ground for mistrial. *See State v. Hughes*, 122 N.H. 781, 451 A.2d 372 (1982). Indeed, the reference to prior incarceration was as consistent with the defendant's professed concern over the consequences of what he had called a scuffle as it was with the charges against him.

At the close of the charge to the jury, defense counsel excepted to the court's instruction on the indictment for use of a firearm in committing or attempting to commit a felony. The court had instructed the jury that attempted first-degree murder, and lesser-included offenses described earlier in the charge, were felonies. The defendant claims that this instruction stated a fact judicially noticed, and that the court had erred in failing to advise him in advance that it would take judicial notice of that fact.

The exception was not well taken. The court was not instructing on the basis of judicial notice of fact. The instruction was in effect an analytical statement that first-degree murder was a specific example of the general category of felony. It explained the relationship between the meanings of two legal terms. The instruction was thus a statement of law.

The defendant has also excepted to his sentence under each charge. On the conviction for attempted second-degree murder the trial court imposed the highest sentence possible under the statute, not less than fifteen nor more than thirty years. The defendant points out that attempted first-degree and attempted second-degree murder are not subject to separate penalty provisions. Rather, RSA 651:2, II-c (Supp. 1983) simply authorizes a sentence of not more than thirty years for "attempted murder." The defendant argues that since the one provision covers attempts to commit both the less serious second-degree murder and the more serious first-degree crime, the highest possible sentence must be reserved for attempted

first-degree murder in order to avoid a violation of the proportionality requirement of part I, article 18 of the State Constitution.

Article 18 provides:

"All penalties ought to be proportioned to the nature of the offense. No wise legislature will affix the same punishment to the crimes of theft, forgery, and the like, which they do to those of murder and treason. Where the same undistinguishing severity is exerted against all offenses, the people are led to forget the real distinction in the crimes themselves, and to commit the most flagrant with as little compunction as they do the lightest offenses. For the same reason a multitude of sanguinary laws is both impolitic and unjust. The true design of all punishments being to reform, not to exterminate mankind."

At the outset, we note that this court has never determined whether this language provides mandatory standards or merely advises or admonishes in the manner of part I, article 38. *State v. Farrow*, 118 N.H. 296, 304, 386 A.2d 808, 813 (1978); *see Trustees &c. Academy v. Exeter*, 90 N.H. 472, 27 A.2d 569 (1940). The strongest expressions of opinion have favored the advisory alternative. *State v. Foster*, 80 N.H. 1, 7, 114 A. 277, 277 (1921); *Weems v. United States*, 217 U.S. 349, 395 (1910) (White, J., dissenting). The issue need not finally be resolved here, however, for we are satisfied that the sentence does not violate article 18 on any interpretation.

Assuming the article's concern extends beyond the improper application of capital punishment, *cf. State v. Farrow supra*, it forbids only gross disproportionality between offense and penalty. *See State v. Dumont*, 122 N.H. 866, 451 A.2d 1286 (1982); *State v. Peabody*, 121 N.H. 1075, 1078, 438 A.2d 305, 307 (1981); *State v. Wheeler*, 120 N.H. 496, 416 A.2d 1384 (1980); *State v. Wentworth*, 118 N.H. 832, 395 A.2d 858 (1978); *cf., e.g., Solem v. Helm*, 103 S. Ct. 3001 (1983) (in applying one of three factors to be considered under eighth amendment proportionality test, the Court stated: "If more serious crimes are subject to the same penalty . . . that is *some* indication that the punishment at issue may be excessive." *Id.* at 3010 (emphasis added)).

Considered alone, there is no gross disproportion between a penalty of fifteen to thirty years and the offense of attempted second-degree murder. In fact the completed crime carries a possible penalty of life imprisonment. RSA 630:1-b, II. Since the general rule is that attempts are subject to the same penalties as the completed crimes, RSA 629:1, IV (Supp. 1983), the special rule for

attempted murder is more lenient than the general rule. The better argument is that the penalty for attempted first-degree murder is too lenient, but that goes to a matter within the legislature's discretion. There is no violation of article 18.

The defendant's final claim is that the superior court erred in setting both a minimum and a maximum term in its sentence of not less than ten or more than twenty years' imprisonment for felonious use of the firearm. While that offense is defined by RSA chapter 650-A (Supp. 1983), sentences are controlled by the provisions of RSA 651:2, II-b (Supp. 1983). This latter section requires imposition of a "minimum" sentence, which may not be concurrent with any other sentence, or subject to suspension or parole.

The defendant argues that the general requirement of minimum and maximum terms imposed by RSA 651:2, II applies only when a defendant may be eligible for parole under RSA chapter 651-A (Supp. 1983). We agree. This issue was considered in *State v. Pratt*, 116 N.H. 385, 359 A.2d 642 (1976). Although the several statutes involved have been amended since that decision, the relationship between RSA 651:2, II (Supp. 1983) and RSA chapter 651-A (Supp. 1983) is nonetheless governed by the holding in *Pratt*, that the specification of minimum and maximum terms is required to determine parole eligibility and duration. The defendant's ineligibility for parole when sentenced for felonious use of a firearm under RSA chapter 650-A (Supp. 1983) and RSA 651:2, II-b (Supp. 1983) renders the requirement of minimum and maximum terms inapplicable, and the court must impose a single, determinate sentence. *Compare Heald v. Perrin*, 123 N.H. 468, 470, 464 A.2d 275, 276 (1983). Accordingly, we remand the case so that the trial court may vacate the existing sentence and resentence the defendant.

*Affirmed in part and reversed in part; remanded.*

DOUGLAS, J., did not sit; the others concurred.