Hillsborough-northern judicial district
No. 2000-789

## THE STATE OF NEW HAMPSHIRE

v.

## VACLAV PLCH

Argued: February 6, 2003
Opinion Issued: June 30, 2003

*Stephen J. Judge*, acting attorney general (*Kelly A. Ayotte*, associate attorney general, on the brief and orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, by brief and orally, for the defendant.

*Vaclav Plch*, by brief, *pro se*.

NADEAU, J. The defendant, Vaclav Plch, appeals his first-degree murder conviction, arguing that the Trial Court (*Groff*, J.) erred in: (1) failing to suppress statements he made during custodial interrogation and after his invocation of the right to counsel; (2) finding that he was adequately informed of his right to have counsel present while being questioned; (3)

failing to suppress evidence seized pursuant to a warrant supported by observations made in a prior illegal search; and (4) limiting evidence that the victim had used prescription medication. We affirm.

We recite the following facts as found by the trial court for purposes of ruling on the defendant's motions to suppress. On July 20, 1999, a headless, dismembered body was found in the Piscataquog River in Manchester. The victim was identified as Mary Stetson, and an autopsy determined that her death had been caused by multiple stab wounds.

On August 5, 1999, the defendant's ex-wife, Donna Plch, reported him missing to the Manchester Police. Ms. Plch called the police again the next morning and asked that an officer be sent to the defendant's apartment. She apparently informed the dispatcher that she hadn't seen the defendant in approximately a month and that a large section of carpet was missing from his bedroom.

Officer Jean Roers was sent to the defendant's apartment to obtain information for an attempt-to-locate report. After obtaining some basic information from Ms. Plch, Officer Roers asked why she had mentioned the missing rug in her call to the police. Ms. Plch then opened the door to the defendant's bedroom and walked in. Officer Roers followed. Ms. Plch showed Officer Roers where a section of carpet had been cut and pointed out that the defendant's fishing tackle was scattered around the room and the bag that usually contained it was missing.

Finding the details of the defendant's disappearance suspicious, Officer Roers informed the detective division of her belief that the defendant may have been the victim of a crime. Detectives arrived at the apartment and interviewed Ms. Plch and the defendant's roommate. The police obtained written consents to search the apartment and the apartment building's common areas from the defendant's roommate and the building's manager respectively.

The police applied for and obtained a search warrant for the first floor of the apartment building, including the defendant's apartment. The search pursuant to the warrant uncovered evidence including blood evidence consistent with DNA profiles of the defendant and the victim.

On August 10, 1999, a warrant issued for the defendant's arrest. Acting on information that the defendant was in Austin, Texas, Lieutenant Putney and Detective Soucy flew there and arrested him.

Lieutenant Putney interviewed the defendant in a police station interview room. He advised the defendant of his rights by reading each right listed on the Austin Police Department's *Miranda* form, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and asking the defendant if he understood that right. With regard to the right to counsel, the following conversation took place:

MP   Okay. It says you have the right to have a lawyer present to advise you prior to you [*sic*] during any questioning. Do you understand that?

VP   Mmm.

MP   Okay. If you are unable to hire a lawyer — okay, if you can't afford a lawyer — you have the right to have, ah, you have a right to have a lawyer appointed to you — to advise you prior to and during any questioning.

VP   Yeah, what does that mean?

MP   That means that if you can't afford one, what happens is you can apply uh, in court, you fill out an affidavit — a financial affidavit saying that you can't afford a lawyer and the court will appoint one for you.

VP   Mmm.

MP   You understand that?

VP   Yeah.

The defendant signed the *Miranda* waiver form and the interview proceeded for approximately forty-five minutes. At that point, the defendant stated: "Now I want my lawyer." The following colloquy then occurred:

MP   You want a lawyer?

VP   Yeah.

MP   You can have a lawyer, but we know what happened that night Billy. And you'll get a lawyer. This was going to be an opportunity, I guess for you to try to convince us of the person you really are. But, that's not gonna happen. And you know what? You're all done. We can't talk to you any longer Billy.

VP   I, I —

MP   Billy, look at me, just look at me and listen to me a minute. Okay? We can not talk to you any longer. You asked for a lawyer. And I have to play by the rules. You understand that?

VP   Ya.

MP   I cannot ask you any more questions. As much as I'd like to, I can't do that. If you have a change of heart and you want to stand up and be the man you want to be and let us know where those body parts are so that family can rest, then you have to tell somebody when you go down stairs that you want to talk to the Detectives. We cannot go to you. We cannot talk to you any longer. You have something to say, you have to tell them that you want to talk to the Detectives. Do you understand?

VP   I understand.

The defendant was then left alone in the room for approximately twenty minutes until Lieutenant Putney returned and informed him of the charge he faced, which prompted the following exchange:

MP   But, this is the complaint against you? I just want you to make sure that it's clear. Okay? You're being charged with second degree murder, okay? That you caused the death of Mary Stetson by stabbing her multiple times in the chest, okay? That's what this complaint states, okay? Do you have any questions with that at all?

VP   That's life prison, right?

MP   Ahh. Well, the penalty is up to the judge and we're not there yet — we're not there yet. You understand?

VP   Mmm.

MP   It's serious — you understand that?

VP   It's serious. Very serious.

MP   It is serious. Taking somebody's life is serious. . . .

Approximate forty minutes later, Detective Soucy and Austin Police Detective Thompson took the defendant to the booking room. The defendant began to make potentially incriminating statements to Detective Soucy, who immediately informed the defendant that he could not speak to him because he had requested an attorney. The defendant nevertheless indicated twice that he wanted to talk at that time. Detective Soucy consulted with Detective Thompson who proposed that they finish the booking process and give the defendant time to think. Detective Thompson then gave the defendant the telephone extension of the homicide unit and told him to have the booking officers call if he still wished to talk.

Meanwhile, the detectives went to the homicide unit where Detective Soucy spoke by telephone with the New Hampshire attorney general's office. Upon advice of an assistant attorney general, Detective Soucy brought the defendant back to an interview room to allow him a chance to speak. The defendant was read his *Miranda* rights, which he waived. During the ensuing interview, the defendant made incriminating statements, including revealing where he had disposed of the missing body parts. The defendant was also interviewed again the next day after an additional *Miranda* waiver.

The defendant moved to suppress his statements to the detectives in the Texas interviews on the grounds that Lieutenant Putney: (1) conducted the functional equivalent of interrogation of the defendant after he had requested counsel; and (2) failed to "adequately and accurately" inform the defendant of his right to have counsel present during questioning. The trial court denied the motion. On appeal, the defendant contends that the court erred in its rulings on both grounds.

In considering each of the defendant's State and Federal Constitutional claims, we first address his claims under our State Constitution, and cite federal opinions for guidance only. *See State v. Ball*, 124 N.H. 226, 231, 233 (1983). "When reviewing a trial court's ruling on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous. Our review of the trial court's legal conclusions, however, is *de novo*." *State v. Roache*, 148 N.H. 45, 46 (2002) (citation omitted).

■ The defendant asserts violations of his rights to due process and counsel, and of the protections against self-incrimination under the Fifth and Fourteenth Amendments to the Federal Constitution and Part I, Article 15 of the State Constitution. The defendant argues that the trial court erred in admitting his custodial statements to the police in Texas because the officers failed to scrupulously honor his invocation of the right to counsel. Both the United States Supreme Court and this court have developed procedural protections to be adhered to during custodial interrogations. *See Roache*, 148 N.H. at 48; *Miranda*, 384 U.S. at 474. Accordingly, before interrogating a person in custody, the police must inform him that "he has a right to remain silent, that anything he says can and will be used against him, and that he has a right to counsel." *Roache*, 148 N.H. at 48. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda*, 384 U.S. at 474; *see also State v. Nash*, 119 N.H. 728, 731 (1979). "Interrogation," for *Miranda* purposes, encompasses not only "express questioning" but also "its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01

(1980). That is, interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301 (footnote omitted). The "functional equivalent" aspect of the term "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* at 301.

The trial court found that Officer Putney's statements to the defendant after he invoked his right to counsel did not constitute the functional equivalent of interrogation. With regard to the conversation about the complaint against the defendant, the trial court held that "advising the defendant of the charge against him was not the effective equivalent of questioning." We find no error in that ruling. *Cf. Enoch v. Gramley*, 70 F.3d 1490, 1500 (7th Cir. 1995), *cert. denied*, 519 U.S. 829 (1996).

We disagree, however, with the trial court's ruling with respect to Lieutenant Putney's statements about the victim's body parts. The court stated:

> It is clear from Lt. Putney's comments in their entirety that the remarks were not from the defendant's perception, reasonably likely to elicit a response. He was immediately and forcefully instructed not to speak, that questioning would not and could not continue, and that he would be provided with a lawyer. It is also significant that Lt. Putney's comments did not elicit a response. . . . It is difficult to comprehend how a statement, from the defendant's perspective, could be found to have been reasonably likely to elicit an incriminating response and yet not, in fact, produce such a response until two hours later.

(Citation omitted.)

That the defendant did not respond, or was prevented from doing so, does not answer the question whether Lieutenant Putney's comments were "[a] practice that the police should know is reasonably likely to evoke an incriminating response from [the] suspect." *Innis*, 446 U.S. at 301. In other words, the nature of Lieutenant Putney's statements and their effect are separate issues.

We conclude that the police should have known that Lieutenant Putney's statements were "reasonably likely to evoke an incriminating response from [the] suspect." *Innis*, 446 U.S. at 301. The comments were specifically designed to elicit the location of the victim's body parts. Admittedly, the police did not want the defendant to provide that information right away, and instructed him that if he wanted to reveal that

information to them he would have to contact them later as they could no longer speak with him. Nevertheless, the comments were intended to persuade the defendant to "have a change of heart" and to "stand up and be the man you want to be" by telling the detectives where the body parts were.

This case is factually similar to *Brewer v. Williams*, 430 U.S. 387 (1977), in which the police, while transporting a suspected killer following his arraignment, sought to elicit the location of the victim's body by stating in part:

> And, since we will be going right past the area on the way into Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered. And I feel we should stop and locate it on the way in rather than waiting until morning and trying to come back out after a snow storm and possibly not being able to find it at all.

*Id.* at 392-93 (quotations omitted). As in this case, the detective sought to delay the suspect's response by stating: "I do not want you to answer me. I don't want to discuss it any further. Just think about it as we're riding down the road." *Id.* at 393 (quotation omitted). Nevertheless, the Supreme Court concluded that "[t]here can be no serious doubt ... that [the detective] deliberately and designedly set out to elicit information from [the suspect] just as surely as — and perhaps more effectively than — if he had formally interrogated him." *Id.* at 399.

█ As *Brewer* involved the right to counsel guaranteed by the Sixth and Fourteenth Amendments, *see id.* at 397-98, it is not controlling here. Nevertheless, we find that the Supreme Court's assessment of the detective's intent supports our conclusion that Lieutenant Putney also "deliberately and designedly set out to elicit information from" the defendant. *Id.* Moreover, while the detective's actual intent is not determinative in the *Edwards* inquiry, *see Edwards v. Arizona*, 451 U.S. 477 (1981), we have found it relevant. Thus, in *State v. Dellorfano*, 128 N.H. 628, 634 (1986), we noted that when a police officer entered the cell block and called out a name known to be the nickname of the perpetrator of a crime, "[i]t is obvious that [the officer] did so in order to prompt an incriminating answer." We then concluded that the officer "at the very least should have known that he was reasonably likely to draw an incriminating response." *Id.*; *see also Innis*, 446 U.S. at 302 n.7. We similarly find that the police should have known that the deliberate

solicitation of information used here would be reasonably likely to elicit a response. Accordingly, we conclude that the police violated the dictates of *Miranda* and *Innis* by failing to cease interrogation of the defendant.

■ Continuation of the interrogation without an attorney present, however, does not automatically render any statement obtained inadmissible. *See Miranda,* 384 U.S. at 475. We have recognized that the admissibility of custodial statements made after a request for counsel is governed by the Supreme Court's decision in *Edwards v. Arizona,* 451 U.S. 477. *See State v. Beaupre,* 123 N.H. 155, 157 (1983). Under *Edwards,* "if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois,* 469 U.S. 91, 95 (1984); *see also State v. Elbert,* 125 N.H. 1, 10 (1984).

■ The trial court found "that the defendant himself initiated further communication with the police." Under New Hampshire law, after the defendant invokes his right to counsel, the State must prove beyond a reasonable doubt that he initiated any further conversation with police. *See Elbert,* 125 N.H. at 10.

■ We have said that the defendant's statement must be "initiated *solely* by him, without *any* prompting by the police." *Beaupre,* 123 N.H. at 158. The defendant argues that Lieutenant Putney's comments to him after his invocation of the right to counsel constituted improper prompting. Improper actions by the police, however, are only part of the *Beaupre* inquiry. The defendant's statement in *Beaupre* did not fall within the *Edwards* exception because it was made "*as the result of* custodial interrogation." *Id.* Thus, to violate the *Beaupre* rule, the police must not only engage in improper prompting, that prompting must also be the cause of the defendant's initiation of further discussions with the police. *See id.*

The defendant did not initiate further discussions with the police until approximately one and a half hours after Lieutenant Putney's comments. At that point Lieutenant Putney went over the defendant's *Miranda* rights again and stated: "Okay. Why don't you tell us what you want to tell us." The defendant did not immediately reveal the location of the body parts. Rather, he began to narrate his version of the events of the night the victim was killed. Some time later, Lieutenant Putney asked the defendant: "You know that she's missing some body parts, right?" The defendant claimed not to know that. Lieutenant Putney then told the defendant that it was important that they try to locate the victim's body parts for her family's sake and asked the defendant to think about that.

The defendant's immediate response was, "I wish I could remember — I don't remember." The interview continued for some time after that, with the defendant continuing to deny remembering disposing of the body parts.

■ Finally, after much coaxing by the police, approximately an hour after the second interview began and two and a half hours after Lieutenant Putney's improper comments, the defendant told the police where the body parts were. Given the significant time lapse and the defendant's continued denials, we conclude that the defendant's initiation of dialogue with the police was not prompted by Lieutenant Putney's improper comments. Thus, the evidence supports the trial court's finding on the issue of initiation. *See Elbert*, 125 N.H. at 10.

■ ■ We next must determine whether the defendant "knowingly and intelligently waived the right" to counsel after previously invoking that right. *Smith*, 469 U.S. at 95. Under New Hampshire law, the State must prove beyond a reasonable doubt that the defendant "was advised of his *Miranda* rights; that he understood and waived each of them, including his right to the presence of counsel during questioning; and that he then made a statement voluntarily." *Elbert*, 125 N.H. at 10. Whether a waiver was knowing, intelligent and voluntary is determined by the totality of the circumstances. *See State v. Benoit*, 126 N.H. 6, 15 (1985). New Hampshire law also requires that once the defendant has invoked his right to counsel, his subsequent waiver, whether oral or written, must be express, *see Nash*, 119 N.H. at 733, "in the sense that the defendant referred expressly to the right or answered a question that referred to it," *Elbert*, 125 N.H. at 9.

The transcript of the second interview reveals that after the defendant was read his *Miranda* rights again, he expressly stated that it was his choice to talk to the detectives and agreed that he wished to talk at that time without a lawyer, thus satisfying the *Nash* requirement. *See Nash*, 119 N.H. at 733; *cf. State v. Chrisicos*, 148 N.H. 546, 550 (2002). In addition, the trial court found that the defendant knowingly, intelligently and voluntarily waived his rights. "Recognizing that a trial court is in the best position to weigh the credibility of the witnesses, we will not reverse its finding on the issue of waiver unless the manifest weight of the evidence, when viewed in the light most favorable to the State, is to the contrary." *State v. Prevost*, 141 N.H. 647, 651 (1997) (quotation omitted).

■ The trial court reviewed videotapes of the three interviews and determined that "the defendant appeared to fully comprehend what the detectives told him. He was articulate, and asked questions when he did not understand." *Cf. State v. Stayman*, 138 N.H. 397, 401 (1994). We also

note that the hour and a half lapse between Lieutenant Putney's comments and the defendant's initiation of further discussions with the police, during which the defendant talked with his ex-wife by telephone, support the conclusion, under the totality of the circumstances test, that the defendant's waiver was voluntary. *Cf. State v. Aubuchont*, 147 N.H. 142, 148 (2001). Upon reviewing the evidence in the light most favorable to the State, we conclude that the trial court's finding of a knowing, intelligent and voluntary waiver is not contrary to the manifest weight of the evidence.

The defendant next argues that the trial court erred in ruling that he was adequately informed of his right to have counsel present while being questioned. We have noted that our State Constitution does not "require any specific code of procedures for protecting the privilege against self-incrimination during custodial interrogation." *Roache*, 148 N.H. at 48 (quotation omitted). We therefore adopt the approach, under our State Constitution, that in reviewing the warnings given, "[t]he inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (quotation and brackets omitted).

The defendant contends that the police confused him by referring to both his right to have a lawyer advise him prior to and during questioning and his right to have a lawyer appointed for him, and, when he asked for an explanation, clarifying only the right to appointment. Thus, the defendant argues that he cannot be presumed to have understood either right. We disagree.

Examination of the entire sequence of *Miranda* warnings reveals that Lieutenant Putney actually read the rights to presence of counsel and appointment of counsel separately, asking the defendant after each whether he understood that right. While Lieutenant Putney reiterated in reading the right to appointment of counsel that it encompassed having appointed counsel present before and during questioning, that fact does not cast doubt on the defendant's clear acknowledgement that he understood the right previously read to him. Rather, the prior acknowledgement indicates that what the defendant did not understand was the right to *appointment* of counsel, a right that Lieutenant Putney then adequately explained. Thus we reject the defendant's argument.

■ The defendant also argues that Lieutenant Putney's explanation of the right to appointment of counsel implied that he could only obtain counsel once he got back to New Hampshire and could apply "in court." The trial court found that Lieutenant Putney's "statements did not impermissibly link the defendant's right to counsel to some unspecified

future time" after interrogation by the police. *See California v. Prysock*, 453 U.S. 355, 360 (1981). We agree. Lieutenant Putney explicitly stated twice that the defendant had the right to have counsel present "prior to [and] during any questioning." We therefore find no error. Nor do we find that any other portions of the interview cited by the defendant indicate his failure to understand this right. Accordingly, we conclude that the warnings given the defendant adequately informed him of his right to counsel.

The defendant next contends that the trial court erred in failing to suppress the evidence obtained in the search of his apartment pursuant to the search warrant. The trial court held that Officer Roer's prior search of the defendant's bedroom was illegal because neither the defendant's ex-wife nor his roommate had authority to consent to a search. The court then stated: "When information obtained through a prior illegal search is contained in an affidavit supporting a search warrant, the remedy in New Hampshire is to excise the unlawfully obtained information, and then re-examine the affidavit to determine whether the warrant is nonetheless supported by probable cause." Accordingly, the court excised from the affidavit information about the missing carpet and the defendant's fishing gear, and held that the warrant was nevertheless supported by probable cause.

The defendant argues that the trial court violated the New Hampshire and United States Constitutions in failing to suppress the evidence obtained by the search warrant. Specifically, the defendant argues that the trial court should have used the "critical element" test, rather than the "excise and ignore" test, to determine whether inclusion in the warrant affidavit of information obtained in the prior illegal search invalidated the warrant.

The defendant contends that the critical element test requires that we consider, rather than ignore, the illegally obtained information presented in support of the warrant. He argues that the test mandates that the evidence be suppressed "[i]f the illegally-obtained information is important, and if the untainted information does not by itself very clearly establish probable cause."

The defendant claims that the critical element test originated in *United States v. Giordano*, 416 U.S. 505 (1974). *Giordano* dealt with the suppression of evidence obtained through interception of wire communications in violation of the procedures specified in Title III of the Omnibus Crime Control and Safe Streets Act of 1968. *See* 18 U.S.C.A. §§ 2510-2520 (West 2000 & Supp. 2003); *Giordano*, 416 U.S. at 507-08. There, the Supreme Court clearly stated that "[t]he [suppression] issue does not turn on the judicially fashioned exclusionary rule aimed at

deterring violations of Fourth Amendment rights, but upon the provisions of Title III." *Giordano*, 416 U.S. at 524. Thus, even if, as the defendant asserts, the Supreme Court fashioned a "critical element" test in *Giordano*, we fail to see how it would apply in the case before us.

■ The trial court followed our settled law in applying the so-called "excise and ignore" test. "[A] warrant based in part on illegally seized evidence is nonetheless valid so long as there was enough other evidence to establish probable cause." *State v. Cimino*, 126 N.H. 570, 574 (1985). Thus, to test the validity of a search warrant issued on an affidavit referencing illegally seized evidence, the reviewing court excises the tainted information and examines the remaining information to determine whether it establishes probable cause. *Cf. State v. Stearns*, 130 N.H. 475, 484 (1988). Nothing cited by the defendant persuades us to abandon this test.

As the defendant does not challenge the trial court's determination that under the excise and ignore test the warrant was supported by probable cause, we need not go further. The trial court's denial of the defendant's motion to suppress evidence from his apartment is affirmed.

As to all of the defendant's constitutional claims, we reach the same result under the Federal Constitution as under our State Constitution. *See Edwards*, 451 U.S. at 484-85 (waiver of rights after assertion of right to counsel); *Hill v. Brigano*, 199 F.3d 833, 842 (6th Cir. 1999) (initiation of further interrogation), *cert. denied*, 529 U.S. 1134 (2000); *Duckworth*, 492 U.S. at 203 (adequacy of *Miranda* warnings); *United States v. Veillette*, 778 F.2d 899, 904 (1st Cir. 1985) (excise and ignore test), *cert. denied*, 476 U.S. 1115 (1986).

Finally, the defendant argues that the trial court erred in limiting evidence that the victim had used prescription drugs. In his second interview with the police in Texas, the defendant stated that he and the victim were drinking heavily at his apartment on the night she was murdered and that he had a headache and asked her if she had anything for it. He said she gave him some white pills, which he took, and they continued drinking. The next thing he said he remembered was waking up the next morning to find a large bloodstain on his carpet. He claimed that being "so screwed up with the alcohol and pills and stuff," he did not remember killing the victim or dismembering her body.

The defendant sought, by motion *in limine*, to introduce evidence that the victim regularly purchased, possessed and used prescription tranquilizers, stimulants and painkillers, to corroborate his statement that the pills the victim gave him, in combination with the alcohol he consumed, made him black out. The defendant alleged that investigation of the

victim's murder "revealed that she regularly and unlawfully used prescription drugs such as Xanax, Percoset and Ritalin." In his supplemental motion *in limine,* the defendant identified two sources of evidence regarding the victim's use of prescription drugs: (1) that in a search of the victim's apartment on the day her body was discovered, the police found "multiple drug vials"; and (2) that an acquaintance of the victim told a defense investigator that "on multiple occasions" the victim had asked him "if she could have his [P]ercosets."

The trial court ruled the evidence inadmissible under New Hampshire Rules of Evidence 403 and 404(b). The court stated:

> The defendant can produce no evidence that these particular drugs can cause black outs. Furthermore, the defendant admittedly had consumed sufficient alcohol to cause him to pass out. This evidence is certainly evidence of prior bad acts on behalf of the victim. The court finds that the minimal probative value of this evidence is substantially outweighed by the danger of unfair prejudice.

The determination whether the probative value of certain evidence is substantially outweighed by the danger of unfair prejudice is a matter within the trial court's discretion, and we will not disturb that determination absent an unsustainable exercise of discretion. *See State v. Berrocales,* 140 N.H. 647, 649 (1996); *State v. Lambert,* 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard). "To establish that the trial court committed an unsustainable exercise of discretion, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of the defendant's case." *State v. D'Amelio,* 148 N.H. 341, 343 (2002) (quotation omitted).

The defendant argues that the trial court could have reduced the prejudicial effect of the evidence by excluding reference to the illegal nature and the victim's use of the drugs, while still allowing evidence as to their possession by and availability to the victim. At trial, the court allowed the defense to question a police officer about the drug vials found at the victim's apartment. Thus, notwithstanding the trial court's *in limine* ruling, the first piece of evidence the defendant identified in his supplemental motion *in limine* was admitted. As for the second piece of evidence, we fail to see how it could be introduced without revealing the illegality of the victim's drug use. Moreover, the defendant offers nothing to bolster the evidence's minimal probative value, as found by the trial court. We conclude that the trial court committed no unsustainable exercise of discretion.

*Affirmed.*

BROCK, C.J., and BRODERICK and DALIANIS, JJ., concurred.