Division of Mental Health and Developmental Services
No. 83-416

*In re* RICHARD M.
(New Hampshire Division of Mental Health
and Developmental Services)

August 5, 1985

*Developmental Disabilities Advocacy Center, Inc.*, of Concord (*M. Elaine Beauchesne* and *Ronald K. Lospennato* on the brief, and *Ms. Beauchesne* orally), for Richard M.

*Stephen E. Merrill*, attorney general (*Loretta S. Platt*, assistant attorney general, on the brief and orally), for the Division of Mental Health and Developmental Services.

DOUGLAS, J.  In this appeal from a ruling of the New Hampshire Division of Mental Health and Developmental Services (division), several issues have been raised with respect to the division's decision that the plaintiff, Richard M., is not developmentally impaired and,

therefore, is not eligible for services under RSA chapter 171-A (1977 and Supp. 1983). We affirm in part, reverse in part and remand.

In summarizing the lengthy procedural and factual history of this case, we refer only to those facts necessary to a determination of the issues raised in this appeal.

In 1971, at the age of 15, Richard M. was involved in an automobile accident and suffered a brain injury. In April 1982, he began receiving services from the Lakes Region Community Services Council, an area agency established for the purpose of administering area-wide programs and services for the developmentally impaired. See RSA 171-A:18 (Supp. 1983). In February 1983, the area agency informed Richard's guardian, Peggy Goodwin, that it did not believe that Richard qualified for services under RSA chapter 171-A (1977 and Supp. 1983), but it agreed to continue to provide services until the question of eligibility was resolved. On March 29, 1983, a client-centered conference was held for the purpose of resolving the eligibility issue.

Thereafter, Ms. Goodwin wrote to the area agency requesting emergency placement services for Richard. In a letter dated April 20, 1983, the area agency informed Ms. Goodwin that it had been determined that Richard was not eligible for services under RSA chapter 171-A (1977 and Supp. 1983) and that services would be terminated on May 20, 1983.

Richard's counsel then sought a review of the decision to terminate services and requested an appeal before the division director. See DIV. MENTAL HEALTH & DEV. SERVS. R. (hereinafter "DIV. R.") He-M 503.17 (1982). On May 24, 1983, a hearing was held, at which time Richard's counsel argued that Richard is developmentally impaired within the meaning of RSA 171-A:2, V (1977 and Supp. 1983) because, as a result of the brain injury received in 1971, he suffers both from a specific learning disability and a condition closely related to mental retardation. On August 10, 1983, the division director, Ronald C. Andrews, upheld the decision of the area agency, reasoning that Richard is not developmentally impaired either as the result of a specific learning disability or as the result of any other condition closely related to mental retardation.

Richard then appealed the director's decision to this court. By order dated April 19, 1984, we granted the State's motion to remand the case to the division for further agency review under a recently promulgated regulation defining "specific learning disability." See DIV. R. He-M 503.02(rr) (1984).

On remand, the division director determined that the regulatory definition of "specific learning disability" includes a brain injury.

*See* DIV. R. He-M 503.02(rr) (1984). The director then stated, however, that the question was whether the specific learning disability meets the definitional criteria of "developmental impairment" set forth in Div. R. He-M 503.02(p) (1984). He determined that Richard's brain injury does not constitute a severe handicap as required by Div. R. He-M 503.02(p)(1)c (1984) and thus upheld the decision of the area agency that Richard is ineligible for services under RSA chapter 171-A (1977 and Supp. 1983). In this appeal, Richard raises four issues with respect to the director's original decision and his decision on remand.

We first address Richard's claim that the director erred on remand when, after finding that a brain injury is a specific learning disability, he applied the regulatory definition of "developmental impairment," *see* DIV. R. He-M 503.02(p) (1984), in determining that Richard is not developmentally impaired within the meaning of RSA chapter 171-A (1977 and Supp. 1983).

The legislature has defined the term "developmental impairment" in RSA 171-A:2, V (1977 and Supp. 1983). That statute provides:

> "'Developmental impairment' means [an impairment] which is attributable to:
>
> (a) mental retardation, cerebral palsy, epilepsy, autism or a specific learning disability; or
>
> (b) any other condition of an individual found to be closely related to mental retardation as it refers to general intellectual functioning or impairment in adaptive behavior or to require treatment similar to that required for mentally retarded individuals which disability: (1) originates before such individual attains age 18, (2) which has continued or can be expected to continue indefinitely, and (3) which constitutes a severe handicap to such individual's ability to function normally in society."

By regulation promulgated pursuant to RSA 171-A:3 (Supp. 1983), the division has established the following definition of that same term:

> "'Developmental impairment' means a disability which is attributable to:
>
> (1) Mental retardation, cerebral palsy, epilepsy, autism, a specific learning disability, or any other condition of an individual which is found to be closely related to mental retardation as it refers to general intellectual functioning or impairment in adaptive behavior or to require treatment similar to that required for mentally retarded individuals which disability:

a. Originates before such individual attains age 18;

b. Has continued or can be expected to continue indefinitely; and

c. Constitutes a severe handicap to such individual's ability to function normally in society. A severe handicap describes a developmentally impaired individual whose needs cannot be met adequately from participating in and benefiting from those social, vocational, recreational, medical, or other resources which generally are expected to be available to other non-handicapped individuals in the community."

DIV. R. He-M 503.02(p) (1984).

Richard argues that the three requirements outlined in the regulatory definition impermissibly modify the entire statutory definition, *see* RSA 171-A:2, V (1977 and Supp. 1983). These requirements in the regulatory definition are that the developmental impairment be attributable to an impairment that: (1) originates before age 18, DIV. R. He-M 503.02(p)(1)a (1984); (2) is expected to continue indefinitely, DIV. R. He-M 503.02(p)(1)b (1984); and (3) constitutes a severe handicap to the individual's ability to function normally in society, DIV. R. He-M 503.02(p)(1)c (1984). Basically, Richard takes the position that the legislature did not intend that the above-mentioned requirements apply where the impairment is attributable to mental retardation, cerebral palsy, epilepsy, autism or a specific learning disability under RSA 171-A:2, V(a) (1977 and Supp. 1983), but, rather, that the legislature intended that the requirements apply only where the impairment is one closely related to mental retardation under RSA 171-A:2, V(b) (1977 and Supp. 1983). The division argues that its regulation comports with the legislative intent and that it has used its rulemaking authority to fill in the details and to clarify the statute in a manner which effectuates the purpose of the act. *See State Farm Mut. Auto. Ins. v. Whaland,* 121 N.H. 400, 404, 430 A.2d 174, 177 (1981).

At the outset, we note that although RSA 171-A:3 (Supp. 1983) authorizes the director of mental health and developmental services to adopt rules to implement RSA chapter 171-A (1977 and Supp. 1983), "administrative officials do not possess the power to contravene a statute." *Woodman v. Perrin,* 124 N.H. 545, 549, 474 A.2d 999, 1002 (1984); *see Kimball v. N.H. Bd. of Accountancy,* 118 N.H. 567, 568, 391 A.2d 888, 889 (1978); *Reno v. Hopkinton,* 115 N.H. 706, 707, 349 A.2d 585, 586 (1975). "It is the responsibility of this court to insure another will is not substituted for that of the legislature when, out of necessity, it delegates certain limited pow-

ers." *Kimball v. N.H. Bd. of Accountancy, supra* at 569, 391 A.2d at 889. "If a board, in making a rule, acts beyond the limited discretion granted by a valid enactment, the rule is invalid." *Id.* at 568, 391 A.2d at 889.

■■ "It is well established that the words in the statute itself are the touchstone of the legislature's intention." *Greenhalge v. Town of Dunbarton*, 122 N.H. 1038, 1040, 453 A.2d 1295, 1296 (1982). "We will examine the legislative intent and the legislation's objectives only when construing an ambiguous statute." *Merrill v. Great Bay Disposal Serv.*, 125 N.H. 540, 542, 484 A.2d 1101, 1102 (1984). Because we conclude that RSA 171-A:2, V (1977 and Supp. 1983) is unambiguous, we confine our review to the actual words of the statute. *Merrill v. Great Bay Disposal Serv. supra.*

■ "Although the legislature is not compelled to follow technical rules of grammar and composition, a widely accepted method of statutory construction is to read and examine the text of the statute and draw inferences concerning its meaning from its composition and structure." *State v. Flynn*, 123 N.H. 457, 462, 464 A.2d 268, 271 (1983). In so doing, we will interpret the words of RSA 171-A:2, V (1977 and Supp. 1983) according to their plain and ordinary meaning. *See* RSA 21:2.

■ We conclude that RSA 171-A:2, V (1977 and Supp. 1983) unambiguously establishes two distinct classes of developmental impairments: (1) those attributable to the specific conditions mentioned in RSA 171-A:2, V(a) (1977 and Supp. 1983); and (2) those attributable to any other condition closely related to mental retardation which (a) occurs before the age of 18; (b) can be expected to continue indefinitely; and (3) constitutes a severe handicap to the ability to function normally in society. The three factors contained in RSA 171-A:2, V(b) (1977 and Supp. 1983) have no application to the conditions specified in RSA 171-A:2, V(a) (1977 and Supp. 1983).

Our conclusion is based upon the structure of the statute and upon the plain and common usage of the word "or" after the conditions specified in subparagraph (a). "The word 'or' is defined as 'a function word to indicate an alternative between different or unlike things. . . .'" *Merrill v. Great Bay Disposal Serv.*, 125 N.H. at 543, 484 A.2d at 1103 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1585 (1961)). Hence, this definition supports our determination that the legislature created two separate classes in RSA 171-A:2, V (1977 and Supp. 1983). In addition, had the legislature intended that the three requirements of subparagraph (b) apply to all of the conditions listed in both (a) and (b), there would have been no reason to create two separate paragraphs.

■■ Accordingly, we conclude that under a plain reading of the statutory provision, the legislature did not intend that the three requirements listed in subparagraph (b) apply to the conditions listed in subparagraph (a). Therefore, to the extent that the regulation at issue defines developmental impairment in a way that applies those three factors to such conditions, it is void. "Those requirements are subject to change or modification by the legislature, but may not be altered by administrative action." *Clark v. N.H. Dep't of Health and Welfare*, 114 N.H. 99, 104–05, 315 A.2d 187, 191 (1974).

We find to be without merit the division's argument that the "long-standing practical and plausible interpretation" the division has accorded RSA 171-A:2, V (1977 and Supp. 1983), without legislative interference, is evidence that its construction conforms to the legislature's intent.

■■ Although "[i]t is a well established principle of statutory construction that a longstanding practical and plausible interpretation given a statute of doubtful meaning by those responsible for its implementation without any interference by the legislature is evidence that such a construction conforms to the legislative intent," *New Hampshire Retail Grocers Ass'n v. State Tax Comm'n*, 113 N.H. 511, 514, 309 A.2d 890, 892 (1973), "[t]his maxim of statutory construction has no application . . . where, as here, the agency's interpretation is in clear conflict with the express statutory language." *Hamby v. Adams*, 117 N.H. 606, 609, 376 A.2d 519, 521 (1977).

Moreover, the record does not support the division's contention that its interpretation was longstanding or without legislative interference. It appears that the division first promulgated regulations under RSA chapter 171-A (1977 and Supp. 1983) in February 1982. The regulation defining developmental impairment was substantially similar to the statutory definition. *See* DIV. R. He-M 503.02(n) (1982). The 1982 regulation remained in effect until February 1984, when the regulation at issue was adopted. After the regulation at issue was adopted, the Joint Legislative Committee on Administrative Rules, by letter dated June 12, 1984, informed the division director that in interpreting the statute to require application of the three limiting factors to all of the conditions specified in the statute, the division was attempting to amend the statutory definition "*contrary to legislative intent.*"

On remand, the division director improperly relied on the invalid regulatory definition of developmental impairment in concluding that Richard is ineligible for services under RSA chapter 171-A (1977 and Supp. 1983), and, consequently, we must reverse his deci-

sion. What we are left with, however, is the director's determination that a brain injury is one of the disorders included in the regulatory definition of specific learning disability, *see* Div. R. He-M 503.02(rr) (1984).

The term "specific learning disability" is defined by regulation as follows:

> "'Specific learning disability' means a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations. The term includes such conditions as perceptual handicaps, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. The term does not include individuals who have learning problems which are primarily the result of visual, hearing, or motor handicaps, of mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage."

Div. R. He-M 503.02(rr) (1984).

In the first sentence of the regulatory definition, the division sets forth a general definition of "specific learning disability." The regulation then specifies certain conditions included in the "term." It is unclear, however, whether the conditions listed in the second sentence must also meet the definition of "specific learning disability" in the first sentence to constitute a "specific learning disability" under the regulatory definition.

"When construing an ambiguous statute, this court looks to both the legislative intent and the objectives of the legislation." *State v. Flynn*, 123 N.H. 457, 464, 464 A.2d 268, 272 (1983). Although the purpose of RSA chapter 171-A (1977 and Supp. 1983) is to provide services for the developmentally impaired, *see* RSA 171-A:1 (Supp. 1983); *see also Developmental Disabilities Advocacy Ctr., Inc. v. Melton*, 521 F. Supp. 365, 369 (D.N.H. 1981), *vacated on other grounds*, 689 F.2d 281 (1st Cir. 1982), it is clear that the legislature intended to provide services only to those who are, in fact, developmentally impaired. *See* RSA 171-A:2, V (1977 and Supp. 1983).

It is obvious to this court that not all brain injuries do, in fact, result in specific learning disabilities and, thus, developmental impairments. We therefore construe Div. R. He-M 503.02(rr) (1984) to require that a brain injury be the cause of a specific learning disability; that is, "a disorder in one or more of the basic psychologi-

cal processes involved in understanding or in using language, spoken or written, which may manifest itself in an imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations. DIV. R. He-M 503.02(rr) (1984).

Because the director made no finding as to whether Richard's brain injury constitutes a specific learning disability, we remand for such a determination. Of course, if the director finds that Richard's brain injury is the cause of a specific learning disability, he also must determine whether and to what extent any impairment suffered by Richard is attributable to his specific learning disability. *See* RSA 171-A:2, V(a) (1977 and Supp. 1983) (developmental impairment is an impairment attributable to a specific learning disability); *see also* RSA 171-A:12 (1977 and Supp. 1983) (individual service plan).

We now turn to the issue whether the director erred in concluding that Richard does not suffer from a condition closely related to mental retardation as specified in RSA 171-A:2, V(b) (1977 and Supp. 1983).

RSA 171-A:2, XIV defines "mental retardation" as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior, and manifested during the developmental period." It is clear that a condition closely related to mental retardation is a condition which involves intellectual functioning and adaptive behavior substantially similar to mental retardation.

In making his determination as to whether Richard suffers from a condition closely related to mental retardation, the director began his analysis by referring to the statutory definition of mental retardation. He then considered the evidence presented in the light of that definition. Relying on the level of education that Richard successfully reached, his intelligence quotient, his scores on a myriad of tests conducted for the purposes of determining his level of intellectual functioning and his deficits in adaptive behavior, and the testimony and documentary evidence of several doctors, the director found that Richard's "level of functioning is not closely related to mental retardation as it relates to general intellectual functioning." The director employed the appropriate analysis and standard in reaching his decision, and the record supports his finding. Accordingly, we conclude that he did not err in ruling that Richard does not suffer from a condition closely related to mental retardation.

Our resolution of the issues discussed above obviates the need to consider the question whether the director's decisions were sup-

ported by the evidence. In addition, we need not address the claim that the hearing officer's use of a text on alcoholism violated Richard's due process rights, because Richard now has notice of the use of the text and will have an opportunity to respond on remand.

*Affirmed in part; reversed in part; remanded.*

All concurred.