Hillsborough-southern judicial district
No. 2008-248

THE STATE OF NEW HAMPSHIRE

v.

ARTHUR KOUSOUNADIS

Argued: February 18, 2009
Reargued: September 10, 2009
Opinion Issued: December 4, 2009

*Kelly A. Ayotte*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*Francis G. Holland*, of Nashua, by brief and orally, for the defendant.

BRODERICK, C.J. The defendant, Arthur Kousounadis, was convicted by a jury in Superior Court (*Lynn*, C.J.) of felony criminal threatening, *see* RSA 631:4, I(a), II(a)(2) (2007); RSA 625:11, V (2007), and violation of a protective order, *see* RSA 173-B:9, III (2002). He was sentenced under RSA 651:2, II-g (2007). We affirm in part, reverse in part and remand.

I

The record supports the following facts. The defendant and his former wife, Aspasia Kousounadis, married in 1972. They divorced in 1996. They reconciled in 2001, and lived together in Lowell, Massachusetts, until the defendant moved out in October 2006. The following month, Aspasia obtained a restraining order against him in a Lowell court. The defendant was present in the courtroom when the order was issued.

On December 1, 2006, the defendant purchased a semi-automatic shotgun with a special scope and ammunition from a sports shop in Hooksett.

When he was filling out the required federal forms, he falsely stated that he was not subject to a restraining order. On December 6, he drove to the Pheasant Lane Mall in Nashua, where Aspasia worked at Macy's. He parked his GMC Jimmy in the parking garage near her Honda. At around 8:30 p.m., Aspasia approached her car. When she opened her car door, she saw the defendant standing in front of her car, near his GMC. He said he wanted to talk; she responded, "No, I don't want to. We're through." After saying, "okay," the defendant opened a back door to his vehicle and took out a shotgun. Aspasia ran as soon as she saw it. While she was running, she heard a gunshot. She kept running until she reached the Macy's employee entrance, where she rang the security bell. She testified at trial that, although she was scared, she was not fearful that she would be shot.

In their investigation of the scene, the police found a shell casing and plastic packing material used in shotgun shells near Aspasia's vehicle. They also found a hole in the wall at Macy's and a shotgun slug inside the store. The defendant went to the Nashua police station the next morning of his own volition and was arrested. He was booked by an officer using standard procedure, and placed in a holding cell.

He was subsequently indicted on one count of attempted murder, one count of felony criminal threatening and one count of violation of a protective order. Prior to trial, he moved to suppress all evidence obtained as a result of his statements to the Nashua police following his arrest on December 7, 2006. After a hearing, the Trial Court (*Mohl*, J.) denied his motion. The defendant also moved to dismiss the charge that he violated a protective order, contending that New Hampshire courts lacked jurisdiction to try him for allegedly violating an order issued in Massachusetts. This motion was also denied. Following a four-day trial, the jury found the defendant guilty of felony criminal threatening and violating a protective order, but not guilty of attempted murder.

The defendant filed two post-trial motions to set aside his conviction for criminal threatening. In the first, he contended that in closing argument, the State had "argued a different crime than was alleged in the indictment." In the second, he argued that because the court failed to instruct the jury on the definition of "deadly weapon," the jury could not have found that the shotgun he used was a deadly weapon, an element of criminal threatening. He also moved to bar application of the enhanced sentencing provisions for use of a deadly weapon, *see* RSA 651:2, II-g, because the jury had not made a factual finding that he used one. The trial court denied all three motions.

On appeal, the defendant argues that the trial court erred in: (1) denying his motion to suppress; (2) denying his motion to dismiss the charge of violating a protective order; (3) denying his two motions to set aside the

criminal threatening verdict; and (4) denying his motion to bar an enhanced sentence. We address each argument in turn.

## II

The defendant first argues that the police subjected him to custodial interrogation without first reading him his *Miranda* rights in violation of Part I, Article 15 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. *See State v. Gagnon*, 139 N.H. 175, 177 (1994); *Miranda v. Arizona*, 384 U.S. 436 (1966). He further contends that the police failed to "scrupulously honor[]" his invocation of his right to counsel. As a result, he asserts that "the [S]tate could not prove beyond a reasonable doubt that [his] confession as to the location of the gun was . . . voluntary." We first address the defendant's arguments under the State Constitution, citing federal opinions for guidance only. *See State v. Ball*, 124 N.H. 226, 231-33 (1983).

When reviewing a trial court's ruling on a motion to suppress, we accept its factual findings unless they lack support in the record or are clearly erroneous. *State v. Plch*, 149 N.H. 608, 613, *cert. denied*, 540 U.S. 1009 (2003). Our review of the trial court's legal conclusions, however, is *de novo*. *Id.*

■ The police must give *Miranda* warnings before conducting custodial interrogation. *State v. Turmel*, 150 N.H. 377, 382 (2003). It is the State's burden to establish beyond a reasonable doubt that a defendant's constitutional rights under *Miranda* were not violated before it is permitted to admit a defendant's statements into evidence. *State v. Chapman*, 135 N.H. 390, 394 (1992). "[O]nce a defendant has invoked his right to counsel by declining to speak to the police without a lawyer present, the police must refrain from or stop interrogation, and scrupulously honor the defendant's right to stop it." *State v. Elbert*, 125 N.H. 1, 9 (1984) (citation omitted) (conducting analysis under the Fifth Amendment to the United States Constitution). The State then bears the burden of proving beyond a reasonable doubt that it was the defendant who initiated further conversation without any prompting from the police. *Plch*, 149 N.H. at 616. The police have a duty to see to it that an opportunity to consult with counsel is provided before further questioning may proceed. *State v. Tapply*, 124 N.H. 318, 325 (1983).

The State does not dispute that the defendant was in custody after he was arrested, booked and placed in a holding cell. However, the record contains conflicting testimony on what occurred following the defendant's arrest. Detective Daniel Archambault, who interviewed the defendant, testified that he did not ask him any questions before he gave him his

*Miranda* warnings and had the defendant sign a form waiving them. In contrast, the defendant testified that Detective Archambault "asked [him] right away . . . what happened at the mall" before informing him of his *Miranda* rights or turning on the interview recording equipment. The trial court considered the defendant's recorded interview with Detective Archambault as well as their conflicting testimony in resolving the issue of credibility in favor of the State.

The defendant argues that because he and Detective Archambault each had a markedly different version of what happened following his arrest, the State failed to prove beyond a reasonable doubt that it had not violated his *Miranda* rights. We disagree. Determining whether the defendant was interrogated prior to his *Miranda* warnings required the trial court to weigh the credibility of the witnesses. It has broad discretion in doing so. *See State v. Patch*, 142 N.H. 453, 458-59 (1997). Based upon the record before us, we cannot say that the trial court's factual finding that the defendant was not subject to custodial interrogation before receiving and waiving his *Miranda* rights either lacked support in the record or was clearly erroneous.

With respect to the defendant's invocation of his right to counsel, we similarly conclude that the trial court's factual finding that the police scrupulously honored it was supported by the record and not clearly erroneous. Detective Archambault interviewed the defendant twice. The first interview was terminated immediately when the defendant requested counsel. The detective told him that if he wanted to speak further, he should tell the booking officer. The defendant was then returned to his cell, and approximately fifteen minutes later, he asked to speak once again with the detective. After they were back in the interview room, the detective turned on the recording equipment and advised the defendant again of his *Miranda* rights, which he again waived. During the second interview, the defendant told the detective where the gun and ammunition were located.

As the trial court observed, the interview transcript established that Detective Archambault terminated the first interview upon the defendant's request for a lawyer. During the second interview, he offered the defendant an opportunity to use the telephone to contact an attorney, which the defendant declined. The detective did not have an obligation to independently contact a public defender on behalf of the defendant, as the defendant's argument suggests. *See Jackson v. Frank*, 348 F.3d 658, 663 (7th Cir. 2003) ("Neither *Miranda* nor any other provision of federal law requires a public defender to be immediately available to a suspect during interrogation."), *cert. denied*, 541 U.S. 963 (2004). Although the defendant

may have made some voluntary statements without first adequately waiving his right to counsel, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478. We conclude that the record does not support the defendant's contention that the police failed to scrupulously honor his invocation of his right to counsel. The State met its burden of proving beyond a reasonable doubt that the defendant's statements were untainted. Accordingly, we hold that the trial court did not err in denying the defendant's motion to suppress.

Because the Federal Constitution does not provide any greater protection than does the State Constitution with regard to the defendant's claims of error, we reach the same result under the Federal Constitution. *See Plch*, 149 N.H. at 620.

## III

Next, the defendant argues that the trial court erred in failing to dismiss the charge that he violated a protective order because "New Hampshire has no jurisdiction over the enforcement of [the Massachusetts] order." He cites no authority to support this argument and concedes that this assertion is contrary to statute. We review the trial court's statutory interpretation *de novo*. *State v. Bernard*, 158 N.H. 43, 44 (2008).

■ RSA 173-B:13, II (2002), entitled "Orders Enforceable," provides: "Any protective order issued by any other state . . . shall be deemed valid if the issuing court had jurisdiction . . . and the person against whom the order was made was given reasonable notice and opportunity to be heard." In addition, "[a] person shall be guilty of a class A misdemeanor if such person knowingly violates . . . any foreign protective order enforceable under the laws of this state." RSA 173-B:9, III (2002). The defendant does not argue that the Massachusetts order was invalid for lack of jurisdiction or due process, nor does he offer any other reason why it should not be enforced. Accordingly, we hold that the trial court properly denied his motion to dismiss.

## IV

Next, the defendant argues that the trial court erred in denying his first motion to set aside the criminal threatening verdict because the State "argued a different crime [during closing argument] than [it] alleged in the indictment." Specifically, the defendant points to the prosecutor's argument that: "When Aspasia took off running, mission accomplished, she's scared, ladies and gentlemen. She's terrified. But he didn't stop there." The prosecutor later stated: "[The defendant] pulled that trigger and he wasn't trying to scare her because she was already terrified at that point. He was

trying to kill her." The defendant contends that these statements are an "admission" that the criminal threatening was complete *before* the shotgun was fired, when Aspasia took off running in fear. The indictment charges that the defendant "purposely attempted to place [her] in fear of imminent bodily injury" when he "pulled out a firearm . . . *and* fired the shotgun." (Emphasis added.) Thus, he argues the State's "admission" in closing argument that Aspasia was scared *before* the shotgun was fired precludes the jury from finding him guilty of each element of the crime. We disagree.

We will uphold a trial court's denial of a motion to set aside the verdict unless its ruling was made without evidence or constituted an unsustainable exercise of discretion. *State v. Spinale*, 156 N.H. 456, 466 (2007). Here, the challenged language in the State's closing argument was neither an "admission" nor directed to the criminal threatening charge. The prosecutor was attempting to persuade the jury that it should find the defendant guilty of attempted murder. In any event, closing arguments are intended to persuade the jury to adopt one party's view of the evidence and are not considered statements of fact. *See State v. Belkner*, 117 N.H. 462, 471 (1977). The court properly instructed the jury that "what is said by the lawyers in closing arguments . . . is not evidence." The record reflects that the jury's verdict was supported by the evidence, and we cannot say that the trial court committed an unsustainable exercise of discretion in denying the defendant's motion.

The defendant further argues that the trial court erred in denying his first motion to set aside the verdict because the State "failed to provide sufficient evidence upon which the jury could enter a finding of guilty on the charge of criminal threatening." Specifically, he argues that the State presented no evidence establishing that when the defendant pulled out the shotgun, he was acting with the purpose of placing Aspasia in fear of *imminent bodily injury*, as opposed to merely placing her in fear generally. To the extent that the defendant is contending that the trial court should have dismissed his case based upon insufficient evidence, we disagree. To succeed on his motion, the defendant had the burden of establishing that the evidence, viewed in its entirety and with all reasonable inferences drawn in favor of the State, was insufficient to prove beyond a reasonable doubt that he was guilty of the crime charged. *State v. Huffman*, 154 N.H. 678, 685 (2007). By the defendant's own admission, he pulled out the gun with the purpose of frightening Aspasia. Whether the defendant purposely placed or attempted to place Aspasia in fear of imminent bodily injury was a question of fact for the jury, and the jury was so instructed. On this record, viewed in the light most favorable to the State, we hold that

there was sufficient evidence presented for the jury to conclude that the defendant acted with the purpose of placing the victim in fear of imminent bodily injury.

## V

Next, the defendant argues that because the trial court failed to instruct the jury on the definition of "deadly weapon," the jury could not have made a finding that the shotgun he used was a "deadly weapon," a necessary element of the felony criminal threatening charge. The State disagrees, and further contends that any error was harmless.

The defendant requested the trial court to include the statutory definition of deadly weapon in the jury instructions. Ultimately, the court instructed the jury on the criminal threatening charge as follows:

> The definition of this crime has three elements, each of which the State must prove beyond a reasonable doubt in order for you to find the defendant guilty of this offense.
>
> These elements are: First, that the defendant attempted to place Aspasia Kousounadis in fear of imminent bodily injury; second, that the defendant did so through conduct that is by removing a deadly weapon, a shotgun, from his car and firing it in the vicinity of Aspasia Kousounadis; and third, that the defendant acted purposely, that is that it was the defendant's conscious object or specific intent to withdraw the shotgun from his car and fire it in the vicinity of Aspasia Kousounadis for the purpose of placing her in fear of imminent bodily injury.

After he was convicted, the defendant moved to set aside the verdict, arguing that the trial court's failure to instruct on the definition of a deadly weapon precluded the jury from rendering a finding on a necessary element of the felony criminal threatening charge.

■ "The purpose of the trial court's charge is to state and explain to the jury, in clear and intelligible language, the rules of law applicable to the case." *State v. McMillan*, 158 N.H. 753, 756 (2009) (quotation omitted). "When reviewing jury instructions, we evaluate allegations of error by interpreting the disputed instructions in their entirety, as a reasonable juror would have understood them, and in light of all the evidence in the case." *Id.* "We determine whether the jury instructions adequately and accurately explain each element of the offense and reverse only if the instructions did not fairly cover the issues of law in the case." *Id.* "Whether or not a particular jury instruction is necessary, and the scope and wording

of the instruction, is within the sound discretion of the trial court, and we review the trial court's decisions on these matters for an unsustainable exercise of discretion." *Id.*

A person commits the crime of criminal threatening when "[b]y physical conduct, the person purposely places or attempts to place another in fear of imminent bodily injury or physical conduct." RSA 631:4, I(a). The crime is a class B felony if the person "[u]ses a deadly weapon as defined in RSA 625:11, V." RSA 631:4, II(a)(2). A deadly weapon is "any firearm, knife or other substance or thing which, in the manner it is used, intended to be used, or threatened to be used, is known to be capable of producing death or serious bodily injury." RSA 625:11, V. The defendant contends that for the shotgun to constitute a deadly weapon, it must be "used, intended to be used or threatened to be used" in a manner "known to be capable of producing death or serious bodily injury." The State disputes the application of the qualifying phrase to "firearm," and argues that a firearm is a deadly weapon *per se* under the statute.

We first address the parties' dispute regarding the statutory meaning of "deadly weapon," and then turn to consider whether the instructions fairly covered the issues of law in the case. The interpretation of a statute is a question of law, which we review *de novo. State v. Dodds*, 159 N.H. 239, 244 (2009). "In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole." *Id.* at 244. We construe provisions of the Criminal Code according to the fair import of their terms and to promote justice. *See* RSA 625:3 (2007). We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *Dodds*, 159 N.H. at 244. Further, we interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language it did not see fit to include. *State v. Hynes*, 159 N.H. 187, 193 (2009). Finally, we interpret a statute in the context of the overall statutory scheme and not in isolation. *Id.*

In construing the plain meaning of deadly weapon, we must discern whether the term "firearm" is modified by the phrase "which, in the manner it is used, intended to be used, or threatened to be used, is known to be capable of producing death or serious bodily injury," RSA 625:11, V. Reviewing the composition and structure of the statute, we conclude that at least two interpretations of the deadly weapon statute are reasonable. On one hand, the comma after "firearm" and the lack of a comma after "knife" might indicate that the legislature composed a list of items to be modified by the qualifying phrase in the latter part of the statute. Under this interpretation, each item listed (any firearm, any knife, any substance and any thing) would be modified by the qualifying phrase, "which, in the

manner it is used, intended to be used, or threatened to be used, is known to be capable of producing death or serious bodily injury." On the other hand, the comma after "firearm" could set off the category of "any firearm" from the category of "knife or other substance or thing," such that the qualifying phrase would modify only the latter category of items. Accordingly, on its face, the statute is subject to two reasonable interpretations with respect to firearms as deadly weapons, *i.e.*, (1) a firearm is a deadly weapon only when it is used, intended to be used, or threatened to be used in a manner that is known to be capable of producing death or serious bodily injury; or (2) a firearm is a deadly weapon *per se. See In re Richard M.*, 127 N.H. 12, 17 (1985) (while the legislature is not compelled to follow technical rules of grammar and composition, the court examines the composition and structure of the text to discern its intended meaning).

The manner in which the term "deadly weapon" is functionally used throughout the Criminal Code does not resolve the ambiguity. *See Hynes*, 159 N.H. at 193 (we interpret a statute in the context of the overall statutory scheme). Each of the crimes that rely upon "deadly weapon" as an element, as well as the enhanced sentencing statute itself, could be implemented using either interpretation. *See, e.g.*, RSA 630:1-a, I (2007) (first degree murder); RSA 635:1, II (2007) (class A felony burglary); RSA 644:1, IV (2007) (class B felony riot); RSA 651:2, II-g (deadly weapon enhanced sentencing). Accordingly, we turn to the legislative history of the deadly weapon statute to discern legislative intent. *See State v. Jennings*, 159 N.H. 1, 5 (2009) (court reviewed legislative history to discern legislative intent where statutory phrase was subject to more than one reasonable interpretation).

The term "deadly weapon" has been part of our substantive criminal law for nearly 150 years. *See, e.g.*, GS 264:7 (1867) (manslaughter enhanced to first degree when perpetrated by person bearing a "deadly weapon"). The legislature first defined the term, however, when it adopted the revised Criminal Code, Laws 1971, 518:1, which became effective in November 1973, *see* RSA 625:2, I (2007). The revised Criminal Code was recommended by the Commission to Recommend Codification of Criminal Laws (Commission), which was created by legislative directive in 1967. Laws 1967, ch. 451. In April 1969, the Commission, chaired by Chief Justice Frank R. Kenison, issued the Report of Commission to Recommend Codification of Criminal Laws (Report) providing a comprehensive draft revised Criminal Code, *see* REPORT at iv, and included comments that detail the source of the recommended language for each draft section, *see, e.g., id.* at iii.

In the Report, the Commission identified its "basic aim" as "produc[ing] a more concise and simplified criminal law than now applies in this state."

*Id.* at iv; *see also* N.H.S. JOUR. 1641-42 (1971). In performing this task, the Commission reviewed draft laws and comments from a wide variety of sources, but "found especially useful the Model Penal Code, the Michigan Revised Criminal Code, Final Draft — September 1967, and the New York Penal Law, 1967." REPORT, *supra* at iii. The Report notes that ultimately, the Commission had been "continuously desirous of shaping a criminal law that is adapted to the conditions and traditions of the State of New Hampshire." *Id.*; *see also* N.H.S. JOUR. 1642 (1971) (revised Criminal Code intended, among other things, to align New Hampshire criminal law with decisions of the supreme court with respect to individual rights).

 With respect to the draft definition section, the comments explain that while some defined terms were adopted from the Model Penal Code, the "deadly weapon" definition was based upon terminology found in the Michigan Revised Criminal Code, Final Draft (1967). REPORT, *supra* § 570:11 (General Definitions) comments at 9. In explaining the intended meaning of the term "deadly weapon," the Commission stated:

> "Deadly weapon" is defined in recognition of the fact that virtually anything, if used in a fitting manner, can cause death or serious injury. Whether there is a deadly weapon involved is, therefore, made to turn on how the actor proposes to use the thing he wields.

REPORT, *supra* § 570:11 comments at 10. Notably, the current provision defining "deadly weapon" is identical to the draft provision as recommended by the Commission. *Compare id.* § 570:11, V *with* RSA 625:11, V. Therefore, we conclude that the legislature, in adopting the Commission's Report, intended for the qualifying phrase comprising the latter portion of the deadly weapon statute to modify each item listed, including "firearm."

 Accordingly, we hold that a firearm is a deadly weapon under RSA 625:11, V if, in the manner it is used, intended to be used, or threatened to be used, it is known to be capable of producing death or serious bodily injury. Therefore, the State bore the burden in this case to prove beyond a reasonable doubt that the defendant used a firearm in such a manner that it constituted a deadly weapon. *See* RSA 631:4, II(a)(2) (criminal threatening is a class B felony when the actor uses a deadly weapon). We have previously held that this is a question of fact for the jury based upon the totality of the circumstances. *State v. Hull*, 149 N.H. 706, 714-15 (2003); *see also State v. Sands*, 123 N.H. 570, 591 (1983) (interpreting State and Federal Constitutions as guaranteeing a jury determination on all factual elements of the crime charged).

 The trial court rejected the defendant's request to instruct the jury on the statutory definition of "deadly weapon," and failed to otherwise

require the jury to determine whether the manner of the use of the shotgun rendered it a deadly weapon within the meaning of the statute. While the jury was asked to find the manner in which the defendant used the shotgun, it was not asked whether using a shotgun in that manner was known to be capable of causing serious bodily injury or death. Rather, the trial court's instruction stated, "removing a deadly weapon, a shotgun, from his car and firing it in the vicinity of Aspasia." Thus, the trial court instructed the jury that a shotgun, used in that manner, was a deadly weapon *per se*. Accordingly, the instructions relieved the jury from its obligation of determining whether the shotgun in this case constituted a deadly weapon. Because the trial court removed from the jury's consideration an element of the felony charge, the jury instructions were in error.

The State alternatively argues, however, that the trial court's instructions required the jury to find that the defendant, in fact, used the shotgun in a manner that satisfies the statutory definition of a deadly weapon. It contends that because the instructions required the jury to find that the defendant purposely withdrew the shotgun and fired it "in the vicinity of Aspasia Kousounadis," the verdict in this case necessarily includes the jury's factual finding that the defendant used a firearm in a manner that qualified it as a deadly weapon. It relies upon *State v. Hatt*, 144 N.H. 246, 248 (1999), in which we held that a firearm that is threatened to be fired at a person is generally understood to be capable of causing death or serious bodily injury.

We disagree with the State's argument, and conclude that its reliance on *Hatt* is misplaced. In *Hatt*, the trial court, sitting without a jury, convicted the defendant of robbing a store while armed with a deadly weapon, based upon its finding that an unloaded handgun, which the defendant threatened to fire at a person, was a deadly weapon under RSA 625:11, V. *Id*. at 246-47. Because *Hatt* involved a bench trial, this finding constituted a factual finding, and not one of law. *See id*. at 246. Moreover, the sole issue on appeal in *Hatt* was one of statutory construction: "whether an unloaded handgun constitutes a 'deadly weapon' as defined by RSA 625:11, V." *Id*. at 247. When we stated that "a firearm, threatened to be fired at a person, is generally understood to be capable of causing death or serious bodily injury," we only answered the statutory question posed, and ruled that the trial court's factual finding was not erroneous as a matter of law. *Id*. at 248.

We cannot conclude, as a matter of law, that charging the jury to determine whether shooting a firearm "in the vicinity" of a person necessarily required the jury to render an essential factual finding on an element of the felony charge — namely, that the defendant used, intended to use, or threatened to use a firearm in a manner that is known to be

capable of producing death or serious bodily injury. Whether the specific *manner* in which the defendant used the shotgun and the circumstances surrounding that use rendered the shotgun a deadly weapon is a factual issue within the exclusive province of the jury. *Hull*, 149 N.H. at 714.

 Finally, the State argues that if the trial court erred in failing to properly instruct the jury on an element of the charged offense, any error was harmless. Not all constitutional errors, however, are subject to harmless error analysis. Some errors require outright reversal. Thus, we must first determine whether the error at issue is subject to harmless error analysis.

 "Generally, . . . if [a] defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." *State v. O'Leary*, 153 N.H. 710, 714 (2006) (quotation omitted). "[O]nly such constitutional errors as necessarily render a trial fundamentally unfair require reversal without regard to the evidence in the particular case." *State v. Williams*, 133 N.H. 631, 634 (1990) (quotation and ellipsis omitted). "Errors that partially or completely deny a defendant the right to the basic trial process, such as the complete denial of a defendant's right to counsel, or adjudication by a biased judge, rise to the level of fundamental unfairness, thereby obviating consideration of the harmless error doctrine." *O'Leary*, 153 N.H. at 714. Though we have never clearly defined any single analytical framework for determining which constitutional errors are or are not subject to harmless error analysis, we have held that certain errors invariably are not. *See State v. Ayer*, 150 N.H. 14, 24-25 (2003) (applying the federal distinction between a "structural defect" and a "trial error," and holding that denial of a defendant's right to self-representation is a "structural defect"), *cert. denied*, 541 U.S. 942 (2004); *State v. Hall*, 148 N.H. 394, 400 (2002) (instructing jury to presume defendant's mental state, the only element at issue); *State v. Reid*, 134 N.H. 418, 423 (1991) (improper jury instruction on the requisite mental state for resisting arrest charge); *Williams*, 133 N.H. at 634-35 (direction of a verdict for the prosecution on an element of the offense).

In *Williams*, the defendant was charged with securities fraud resulting from false and misleading statements he made while selling interests in limited partnerships. *Williams*, 133 N.H. at 632-33. The trial judge instructed the jury that the limited partnership interests the defendant sold *were* securities. Both the State and the defendant agreed this should have been a determination of fact made by the jury as an element of the crime, but the State argued that the harmless error doctrine applied. *Id.* at 633-34. We held that it did not, because the trial judge's error was "akin to

the direction of a verdict for the prosecution on an element of the offense charged," and therefore "a constitutional error requiring reversal without regard to the weight of the evidence." *Id.* at 634.

██ The present case is no different from *Williams* in that the trial court essentially instructed the jury that the shotgun used by the defendant *was* a deadly weapon, just as the trial court in *Williams* instructed the jury that the partnership interests sold *were* securities. To reach a verdict of guilty, the jury was required to find that the defendant used the shotgun as a deadly weapon, *i.e.*, in a manner "known to be capable of producing death or serious bodily injury." RSA 625:11, V. The jury was never instructed on the definition of deadly weapon; thus, its verdict was necessarily incomplete and "akin to the direction of a verdict for the prosecution on an element of the offense charged." *Williams*, 133 N.H. at 634. Accordingly, the jury instruction is not subject to harmless error analysis.

██ ██ The State argues that our holding in *Williams* has been "implicitly overruled" by the United States Supreme Court in *Neder v. United States*, 527 U.S. 1 (1999). We recognize that the federal opinions we cited for guidance in *Williams* have been modified by subsequent decisions of the United States Supreme Court. *See, e.g., Neder*, 527 U.S. at 9-15 (holding that an instruction that omits an element of the offense is subject to harmless error analysis). *Neder*, however, has been widely criticized, and we decline to follow it with regard to our interpretation of the New Hampshire Constitution. As one commentator noted:

> Harmless error analysis depends upon the existence of a verdict of guilty beyond a reasonable doubt on the elements of the crime. The appellate court must assess the possibility that the error affected the jury's verdict. If there is no verdict on an element of the crime, it is not possible to conclude that the error did not affect the verdict.

Carter, *The Sporting Approach to Harmless Error in Criminal Cases: The Supreme Court's "No Harm, No Foul" Debacle in Neder v. United States*, 28 AM. J. CRIM. L. 229, 232 (2001); *see also* Fairfax, *Harmless Constitutional Error and the Institutional Significance of the Jury*, 76 FORDHAM L. REV. 2027, 2030 (2008) (arguing that jury instructions that omit an element of the offense produce "flawed verdicts" that cause "profound . . . injury" to "the very structure of the Constitution itself" and to the jury's role in criminal trials).

As Justice Scalia pointed out in his *Neder* dissent, it is "structural error," not subject to harmless error analysis, for a court to enter a directed verdict, "no matter how clear the defendant's culpability." *Neder*, 527 U.S.

at 32-33 (Scalia, J., dissenting). By the same token, "failure to prove one [element], no less than failure to prove all, utterly prevents conviction." *Id.* at 33. The failure to instruct the jury on one element of a crime is thus indistinguishable from a directed verdict, and deprives a defendant of his right to a jury trial. *See id.* at 31 (explaining that "trial by jury means determination by a jury that *all elements* were proved"). Moreover, "[t]he very premise of structural-error review is that even convictions reflecting the 'right' result are reversed for the sake of protecting a basic right." *Id.* at 34; *see also Ayer*, 150 N.H. at 24-25 (applying the federal distinction between a "structural defect" and a "trial error").

▮ This court "has the power to interpret the New Hampshire Constitution as more protective of individual rights than the parallel provisions of the United States Constitution." *Ball*, 124 N.H. at 231-32. We reaffirm that under our State Constitution, a jury instruction that omits an element of the offense charged is an error "that partially or completely den[ies] a defendant the right to the basic trial process," *O'Leary*, 153 N.H. at 714, and thus is not subject to harmless error analysis, *see Williams*, 133 N.H. at 634. Accordingly, we reverse the defendant's conviction on the felony criminal threatening charge and remand for further proceedings consistent with this opinion.

## VI

The defendant's argument that the trial court erred in denying his motion to bar imposition of an enhanced sentence is based upon the jury instruction argument described above and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Under *Apprendi*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proven beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. Because we reverse the defendant's felony criminal threatening conviction, we need not address whether the trial court erred in imposing an enhanced sentence for this charge.

*Affirmed in part; reversed in part; and remanded.*

DUGGAN and CONBOY, JJ., concurred; DALIANIS, J., with whom HICKS, J., joined, concurred in part and dissented in part.

DALIANIS, J., concurring in part and dissenting in part. I join the majority opinion with respect to parts I, II, III and IV, but respectfully dissent with respect to parts V and VI. The majority concludes that the trial court's failure to instruct the jury on the definition of a deadly weapon, *see* RSA 625:11, V (2007), is an error that defies harmless error analysis

pursuant to our interpretation of the New Hampshire Constitution in *State v. Williams*, 133 N.H. 631, 634-35 (1990). I agree that this case is like *Williams*, but I disagree that *Williams* is still good law. Instead, I would follow the approach taken by the United States Supreme Court in *Neder v. United States*, 527 U.S. 1, 8-15 (1999), apply harmless error analysis, and conclude that the State has met its burden in proving any error was harmless beyond a reasonable doubt.

I do not lightly recommend overruling *Williams*. "The doctrine of stare decisis demands respect in a society governed by the rule of law because, when governing legal standards are open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results." *State v. Holmes*, 154 N.H. 723, 724 (2007) (quotations omitted). When asked to reconsider a previous holding, the question is not whether we would decide the issue differently *de novo*, but whether the ruling has come to be seen so clearly as error that its enforcement was for that very reason doomed. *Id.* Several factors inform our judgment, including whether: (1) the rule has proven to be intolerable simply by defying practical workability; (2) the rule is subject to a kind of reliance that would lend a special hardship to the consequence of overruling; (3) related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine; and (4) facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification. *Id.* at 724-25. I believe the third factor compels us to overrule *Williams*. Related principles of both federal and State law with respect to harmless error review of constitutional errors have so far developed as to have left the old rule from *Williams* no more than a remnant of abandoned doctrine.

In *Williams*, the defendant was charged with securities fraud resulting from false and misleading statements he made while selling interests in limited partnerships. *Williams*, 133 N.H. at 632. The trial judge instructed the jury that the limited partnership interests the defendant sold *were* securities. *Id.* at 633. Both the State and the defendant agreed this should have been a determination of fact made by the jury as an element of the crime, but the State argued that the harmless error doctrine applied. *Id.* at 633-34. We held that harmless error did not apply because the trial judge's error was "akin to the direction of a verdict for the prosecution on an element of the offense charged," and therefore "a constitutional error requiring reversal without regard to the weight of the evidence." *Id.* at 634.

In *Williams*, we relied upon federal opinions for guidance that have since been clarified by subsequent decisions of the United States Supreme Court. *See, e.g., Neder*, 527 U.S. at 15 (holding that an instruction that omits an element of the offense is subject to harmless error analysis). In *Neder*, the

defendant was convicted by a jury in Federal District Court of several fraud and tax offenses as a result of engaging in real estate transactions financed by fraudulently obtained bank loans. *Id.* at 4, 6. At trial, the District Court erroneously instructed the jury that it need not consider the issue of materiality of any false statements to convict on the tax offenses and bank fraud. *Id.* at 6. It similarly failed to include materiality as an element of mail fraud and wire fraud in instructing the jury on those charges. *Id.* Nonetheless, the United States Court of Appeals for the Eleventh Circuit affirmed the conviction, holding that although the District Court's instructions were error, the error was subject to harmless error analysis, and that the error was harmless because "materiality was not in dispute" and, therefore, the error "did not contribute to the verdict." *Id.* at 7 (quotations omitted).

The United States Supreme Court granted certiorari to decide "whether, and under what circumstances, the omission of an element from the judge's charge to the jury can be harmless error." *Id.* Relying upon some of the cases we looked to for guidance in deciding the same issue in *Williams,* the Court held that a jury instruction that omits an element of the offense is an error that "differs markedly from the constitutional violations we have found to defy harmless-error review." *Id.* at 9. The Court further reasoned: "We have often applied harmless-error analysis to cases involving improper instructions in a single element of the offense." *Id.* at 9. To support this assertion, the Court cited *Rose v. Clark,* 478 U.S. 570 (1986), which we also cited in *Williams.*

At issue in *Clark* was the trial court's erroneous instruction charging the jury to presume malice "in the absence of evidence which would rebut the implied presumption" for a second degree murder charge where malice was one of the elements of the crime. *Clark,* 478 U.S. at 574 (quotation omitted). Although the *Clark* Court held that the error in that case was subject to harmless error analysis, *id.* at 580, it also said: "harmless-error analysis presumably would not apply if a court directed a verdict for the prosecution in a criminal trial by jury." *Id.* at 578. When we decided *Williams,* we understood this phrase to mean that if a court "direct[s] a verdict for the prosecution" on a single element of the offense, this type of error could never be subject to harmless error review. *Williams,* 133 N.H. at 634. At the time, some federal courts of appeals had drawn similar conclusions. *See Hoover v. Garfield Heights Mun. Court,* 802 F.2d 168, 177 (6th Cir. 1986), *cert. denied,* 480 U.S. 949 (1987); *United States v. White Horse,* 807 F.2d 1426, 1429 (8th Cir. 1986). While our interpretation of *Clark* in *Williams* may have been an accurate statement of federal law at the time, *Neder* represents a development in the law such that this interpretation is no

longer good federal law. Indeed, the *Neder* Court relied upon *Clark* to reach the exact opposite of the conclusion we reached in *Williams*.

Related principles of New Hampshire law with respect to what types of constitutional error are subject to harmless error analysis have also developed post-*Williams*. For example, we expressly adopted the federal distinction between a "structural defect" and a "trial error." *See State v. Ayer*, 150 N.H. 14, 24-25 (2003), *cert. denied*, 541 U.S. 942 (2004). As we explained in *Ayer*, "[a] structural defect affects the very framework in which a trial proceeds" and arises "from errors that deprive a criminal defendant of the constitutional safeguards providing a fair trial." *Id.* at 24. A "trial error," by contrast, "occurs during the presentation of a case to a jury and can be quantitatively assessed in the context of other evidence in order to determine whether the error was harmless beyond a reasonable doubt." *Id.* (quotation and brackets omitted). While the harmless error doctrine applies to trial errors, it does not apply to structural errors. *See id.*

Unlike the majority, which apparently, though not explicitly, believes the error to be a structural error, I believe that a jury instruction that omits an element of the offense is a trial error. *Neder*, 527 U.S. at 15. It can be quantitatively assessed in the context of other evidence to determine whether the error was harmless beyond a reasonable doubt. The case before us provides a fitting example because there was no evidence to suggest that the defendant used the shotgun in such a way that it was not a deadly weapon, nor does he suggest that he would offer any upon remand. Accordingly, when assessed in context, we can easily determine that the result would be the same and that the error was harmless beyond a reasonable doubt.

*Williams*, I believe, is also out of step with basic tenets we have recently reaffirmed concerning the applicability of harmless error analysis under the New Hampshire Constitution. Specifically, "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." *State v. O'Leary*, 153 N.H. 710, 714 (2006) (quotation omitted). Here, the defendant had counsel at all stages of the proceedings, and he does not contend that the judge was biased. Thus, there was a presumption that the instructional error was subject to harmless error analysis.

In light of these subsequent developments of related principles of both state and federal harmless error law since we decided *Williams*, I would conclude that related principles of law have so far developed as to have left the old rule from *Williams* no more than a remnant of abandoned doctrine. I would, therefore, overrule *Williams*, holding that an instruction that omits an element of the offense can be subject to harmless error analysis.

Such a holding, moreover, is consistent with more recent decisions of other jurisdictions. *See, e.g., Com. v. McCombs,* No. 2007-SC-000127-DG, 2009 WL 735794, at *4 (Ky. Mar. 19, 2009); *State v. Daniels,* 91 P.3d 1147, 1156 (Kan.) *cert. denied,* 543 U.S. 982 (2004); *State v. Flanagan,* 680 N.W.2d 241, 244-45 (N.D. 2004).

I would then examine whether the error at issue was, in fact, harmless. An error is harmless only if it is determined, beyond a reasonable doubt, that the verdict was not affected by the error. *State v. Connor,* 156 N.H. 544, 549 (2007). The State bears the burden of proving the error was harmless. *Id.*

> The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

*State v. Dupont,* 149 N.H. 70, 74 (2003) (quotation omitted).

I would hold that the State met its burden of proving harmless error in this case. By his own admission, the defendant brandished a shotgun in response to his wife's refusal to speak to him, with the purpose of scaring her. The third element in the instructions required the jury to find that "it was the defendant's conscious object or specific intent to withdraw the shotgun from his car and fire it in the vicinity of Aspasia Kousounadis." Firing a shotgun in the vicinity of the victim is using it in a manner "known to be capable of producing death or serious bodily injury." RSA 625:11, V. Accordingly, the instructions taken as a whole required the jury to find, independent of the erroneous instruction, that the defendant used the shotgun as a "deadly weapon," despite the trial court's failure to inform the jury of the statutory definition of that term. Thus, the verdict was unaffected by the error.

Other considerations regarding whether an error is subject to harmless error analysis are also satisfied here, as discussed above. Therefore, I would hold that the trial court's failure to instruct the jury on the statutory definition of a deadly weapon was harmless error.

I would apply similar reasoning to reject the defendant's argument that the trial court erred in denying his motion to bar imposition of an enhanced sentence. His argument is based upon the erroneous jury instruction regarding the definition of a deadly weapon and *Apprendi v. New Jersey,* 530 U.S. 466 (2000). Under *Apprendi,* any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proven beyond a

reasonable doubt. *Apprendi*, 530 U.S. at 490. The defendant advances his argument only under the Federal Constitution. *See State v. Dellorfano*, 128 N.H. 628, 632-33 (1986) (holding that when a defendant fails to cite a New Hampshire constitutional provision, we will not perform a state constitutional analysis). The United States Supreme Court has held that *Apprendi* claims are subject to harmless error analysis. *See Washington v. Recuenco*, 548 U.S. 212, 218-22 (2006). Accordingly, I would apply harmless error analysis and reject this argument for the same reasons as above.

HICKS, J., joins in the dissent.